IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ART MIDWEST, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:99-CV-2355-N |
| DAVID M. CLAPPER, *et al.*, | § § § | |
| Defendants. | § | |

### ORDER

This Order addresses the parties' cross-motions for summary judgment [545 & 563], Defendants' motion to tax costs incurred on appeal [537], Defendants' motion to compel [551], and Plaintiffs' motion for leave to amend the complaint [581]. For the reasons given below, the Court grants in part and denies in part both motions for summary judgment, grants Defendants' motion to tax costs, grants in part Defendants' motion to compel, and denies Plaintiffs' motion for leave to amend.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the collapse of a partially-consummated sale of apartments complexes. The case has a long and detailed history that the Court will only summarize here in part for purposes of this Order.

#### A. Factual History

The parties in this case each played a role in a real estate transaction that failed more than nine years ago. The goal of that transaction, generally speaking, was the transfer of

three groups of apartments from Defendants David M. Clapper, Atlantic Midwest L.L.C. ("Atlantic Midwest"), Atlantic XIII L.L.C. ("Atlantic XIII"), and other related entities (collectively, the "Clapper Entities") to Plaintiffs Art Midwest, Inc. ("ART Midwest"), American Realty Trust, Inc. ("ART"), and other related entities (collectively, the "ART Entities").[1] On November 3, 1998, the parties entered into a number of agreements that set forth the core provisions of their planned transaction. One was a Master Agreement ("MA"), which generally served as the overarching backbone of the deal.[2] In addition, three Contribution and Exchange Agreements ("C&E Agreements"), each governing the sale of one or more apartment complexes located in a particular geographic region, set forth the "nuts and bolts" of the deal.[3]

Through these agreements, the parties organized the transaction so that an intermediate entity, ART Midwest L.P.[4] (the "Partnership"), would be the nominal buyer of all properties. According to the terms of the C&E Agreements, a subset of the Clapper Entities (the numbered Atlantic L.L.C.'s – e.g., Atlantic XIII) would transfer the various

---

[1] For simplicity, the Court refers to Plaintiffs as the "ART Entities" and to Defendants as the "Clapper Entities," even though not every party in the real estate transaction is now a party in this case.

[2] The MA is, by its own terms, governed by Texas law.

[3] Only two of the three C&E Agreements play a role in this case. Those two are the Indianapolis, Indiana C&E Agreement and the Toledo, Ohio C&E Agreement. They are governed by Indiana and Ohio law, respectively.

[4] ART Midwest L.P. was once a defendant in this case, but was dismissed by stipulation of the parties.

ORDER – PAGE 2

apartment complexes to the Partnership in exchange for limited partnership units (the "Units"), worth $1 each.

Pursuant to the terms of the MA, the ART Entities fronted $5.5 million for various deposits before the deal was abandoned (collectively, the "Deposit"). This amount included a cash deposit of $500,000, which was placed in escrow, an initial $2 million promissory note to Clapper, and another $3 million in promissory notes to Clapper in exchange for twice extending the deal's closing date.

The MA also sets forth a framework of remedies in the event either side walked away from the deal. These provisions distinguish between a "termination" and a "default," with each triggering different rights or obligations for the party walking away from the deal. The MA states that the ART Entities may "terminate" the entire transaction by backing out of any one of the C&E Agreements for any of a number of legitimate reasons, such as a title problem affecting one of the complexes. MA section 14(a) states that:

> If the Partnership elects for any reason permitted by the applicable Contribution and Exchange Agreements or the Stratford Square Purchase Agreement, (including, without limitations that the Existing Lender will not give a required Consent, because of a title or survey problem, because of the occurrence of a material adverse event, or because of the occurrence of any other condition precedent to the Partnership's obligation to consummate the Transaction) to terminate any Contribution and Exchange Agreement or the Stratford Square Purchase Agreement, this Agreement, all of the Contribution and Exchange Agreements and the Stratford Square Purchase Agreement shall automatically be terminated, (i) in which event the Deposit shall be returned to the Partnership, and (ii) the parties shall be relieved of all further obligations to each other, except for those obligations which . . . survives [sic] such termination.

Accordingly, standing alone, the MA provides that, if the Partnership "terminates" any one of the C&E Agreements, *all* C&E Agreements are thereby terminated and the Partnership may reclaim the Deposits. In this respect, the MA contemplates an "all or nothing" transaction, with all three C&E Agreements closing at the same time or, in the event of some legitimate concern with even a single complex, none closing at all.

A "default" occurs when one side walks away from the transaction for any other reason. MA section 18(a) states that:

> If ART or the Partnership shall default in any of its obligations under this Agreement, any Contribution and Exchange Agreement or the Stratford Square Purchase Agreement, and the default continues beyond the notice and cure period set forth herein, the Partnership shall be deemed to have defaulted under all the Contribution and Exchange Agreements and the Stratford Square Purchase Agreement. In such case, the [Clapper] Entities, acting together, shall have the right, as the [Clapper] Entities' collective sole and exclusive remedy, to terminate all of the Contribution and Exchange Agreements, the Stratford Square Purchase Agreement and this Agreement, whereupon (i) the Escrow Agent shall pay the Deposit to Clapper, as agent for the [Clapper] Entities, and the [Clapper] Entities shall be entitled to retain the full amount of the Deposit, not as a penalty, but in liquidation of all damages suffered by the [Clapper] Entities . . . , and (ii) the [Clapper] Entities shall have no other remedy against ART or the Partnership for damages either at law or in equity.

Accordingly, standing alone, the MA provides that, if the Partnership "defaults" on any one of the C&E Agreements, the Partnership forfeits the Deposit to the Clapper Entities as liquidated damages, which is the Clapper Entities' "sole and exclusive remedy."

In a confusing and largely unexplained turn of events, the parties went on immediately to amend the C&E Agreement between the Partnership and Atlantic XIII on the same day the parties entered into the MA and the three C&E Agreements. This particular C&E Agreement (as amended, the "First Amended Contribution and Exchange Agreement" or

"FAC&E Agreement") governed the sale of two apartment complexes located in Indianapolis, Indiana (the "Indiana Apartments"). As amended, the FAC&E Agreement provided for the transfer of the Indiana Apartment on an expedited basis; apparently so that the ART Entities could make necessary repairs to one of the complexes before winter. According to its own terms, the FAC&E Agreement controls "notwithstanding anything to the contrary contained in the Master Agreement."

According to the terms of the FAC&E Agreement, the Partnership agreed to pay for the Indiana Apartments in two installments. The Partnership agreed to pay one-half of the total purchase price – that is, one-half of the total number of Units owed – when the parties closed on the FAC&E Agreement and transferred the Indiana Apartments. The remainder of the purchase price (in Units) would not become due until the parties transferred the remaining apartment complexes (according to the nonexpedited terms of the remaining two C&E Agreements). The parties closed on the Indiana Apartments on November 19, 1998.[5]

The FAC&E Agreement's terms also dictate the parties' rights in the event that one side or the other abandoned the deal after the Indiana Apartments were transferred, but before the remaining properties were transferred. According to FAC&E Agreement section 5(b):

> If and in the event all the other Contribution and Exchange Agreements are terminated by the Partnership as permitted by the Master Agreement, or by virtue of a default by the Partnership, then, as an initial matter, the Partnership may elect to pay the balance of the Consideration to Transferor . . . , in which

---

[5]To the extent that there were any closing papers related to the Indiana complexes in addition to the FAC&E Agreement, those papers do not appear to be in the record.

ORDER – PAGE 5

> event Transferor shall have no further interest in the Assets. Such election shall be made within ten (10) days after the date of termination of the other Contribution and Exchange Agreements . . . . If the Partnership does not elect to pay the balance of the Consideration, Transferor may elect within ten (10) days following the date of notice of non-election, either (1) to waive the balance of the Consideration, in which event the Partnership shall own the Assets free and clear of any claim by Transferor; or (2) repurchase the Assets by (i) returning the Units to the Partnership; (ii) causing the Partnership to be relieved of recourse under the First Lien Loans; and (iii) reimbursing the Partnership for fifty percent (50%) of the costs of any physical improvements to the Assets incurred by the Partnership from the Closing Date to the date of termination.

Accordingly, the FAC&E Agreement states that (notwithstanding language to the contrary in the MA), if the Partnership "defaults" on or "terminates" one of the remaining C&E Agreements *after the parties close on the Indiana Apartments*, the Partnership may elect to pay the balance owed on the Indiana Apartments and keep them. If the Partnership chooses not to pay the remaining balance, Atlantic XIII may elect to either (i) waive the remaining balance owed and let the Partnership keep the apartments "free and clear of any claim by" Atlantic XIII, or (ii) "repurchase" the Indiana Apartments by returning the (one-half) compensation it received at the closing.

In addition to its expedited timing, transfer of the Indiana Apartments was complicated by a mortgage on one of the complexes. This mortgage was held by Inland Mortgage Corp. ("Inland"), with Atlantic XIII as the borrower and David Clapper the guarantor. As a condition of the Indiana closing, the Partnership and ART Country Squire, L.L.C. ("ART Country Squire") entered into a "First Lien Loan Indemnification, Assumption

and Modification Agreement" ("FLLIA") with Clapper and Atlantic XIII in which the two entities agreed to indemnify and defend Clapper and Atlantic XIII against Inland.[6]

Following the Indiana closing and just before the two remaining C&E Agreements were scheduled to close, the Partnership sent a letter to Clapper purporting to "terminate" the Toledo, Ohio C&E Agreement. The Partnership claimed that a legal nonconforming zoning use of a portion of the Toledo, Ohio complex constituted a title defect, and thus grounds for termination of the entire deal under the MA. The Partnership went on to state that, as a result of this termination, all C&E Agreements were automatically terminated, to demand return of the Deposits, and to request that Clapper repurchase the Indiana Apartments. The Clapper Entities refused to release the Deposit, and Atlantic XIII refused to return its Units.

The ART Entities failed to get financing to pay the Inland note prior to the Partnership's purported termination, and, presumably, quit trying afterwards. When the note matured, Inland foreclosed and brought suit against the parties. When Atlantic XIII and Clapper tried to enforce the FLLIA, the Partnership and ART Country Squire filed petitions for bankruptcy.

---

[6]The parties and Inland later entered into an "Assumption, Modification and Extension Agreement" (the "Assumption Agreement"), in which Inland consented to the transfer of the affected complex and agreed to extend the maturity date of its note.

### *B. Procedural History*

When the Clapper Entities refused to return the Deposit and repurchase the Indiana Apartments in response to the Partnership's purported termination of the entire deal, the ART Entities brought this action alleging claims for, among others, fraud and a declaratory judgment that the ART Entities properly terminated the entire transaction and, therefore, are entitled to reclaim the Deposit. The Clapper Entities countersued, alleging seventeen causes of action for breach of and/or tortious interference with the FAC&E Agreement, the FLLIA, the Assumption Agreement, and the Partnership's partnership agreement (the "Partnership Agreement"), as well as corresponding declaratory judgment claims. After a trial before the Honorable Jerry Buchmeyer, the jury returned a verdict in favor of the ART Entities on their declaratory judgment claim, finding that the ART Entities properly terminated the deal and therefore were entitled to their Deposit. The jury, however, found against the ART Entities on their fraud claims.

The Clapper Entities appealed. The ART Entities did not to cross-appeal. On appeal, the Fifth Circuit reversed the jury verdict, holding that a legal nonconforming zoning use does not render a title unmarketable and, therefore, does not provide a legitimate basis for "terminating" the transaction under section 14 of the MA. *ART Midwest, Inc. v. Clapper*, 242 Fed. App. 130, 132 (5th Cir. 2007). With leave of the Court, the parties have now filed cross-motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, courts need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In doing so, the nonmovant may not rely on "naked assertions of an actual dispute" but instead "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *In re Lewisville Props., Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) (citing *Anderson*, 477 U.S. at 255-56). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to

establish an element essential to its case, the Court must grant summary judgment. *Celotex*, 477 U.S. at 322-23.

### III. THE CLAPPER ENTITIES' DECLARATORY JUDGMENT CLAIMS ARE SUPERFLUOUS

As an initial matter, the Court grants summary judgment against the Clapper Entities on Counts II, X, XII, XIV, and XVI of their counter-complaint. Each of these declaratory judgment counts precedes an affirmative claim for breach of and/or tortious interference with a contract based on the very same allegations. For example, in Count XIV the Clapper Entities seek a declaration that the Partnership has failed to distribute "quarterly preferred returns" as required by the Partnership's partnership agreement ("Partnership Agreement") since March 1999. Then, in Count XV, the Clapper Entities assert a claim for breach of the Partnership Agreement for failure to distribute quarterly preferred returns since March 1999. Accordingly, the Court declines to consider these claims for declaratory relief because the Clapper Entities have pled corresponding affirmative claims that, if ultimately successful, offer more effective and appropriate relief. *See Navistar Int'l Corp. v. Emery*, 643 F. Supp. 515, 517 (N.D. Tex. 1986) ("The Court declines to grant declaratory relief because another remedy will be more effective or appropriate under the circumstances.").

### IV. THE ART ENTITIES DEFAULTED UNDER THE MASTER AGREEMENT AND THEREBY FORFEITED THE DEPOSIT TO THE CLAPPER ENTITIES

The Court next holds that the ART Entities "defaulted" according to the terms of the MA and, therefore, the Clapper Entities are entitled to the Deposit. From the inception of this case, the ART Entities have insisted that a title problem was the basis for their decision to allegedly "terminate" the transaction. Now that the Fifth Circuit has rejected this

argument, the ART Entities claim to have additional fraud-based justifications for backing out of the deal. However, the ART Entities are precluded from raising those arguments now because they failed to advance them at any time before in this case's lengthy history. Furthermore, after winning on the title issue before Judge Buchmeyer, the ART Entities chose not to cross-appeal when the Clapper Entities appealed. Accordingly, the ART Entities have waived any argument other than their already-rejected marketable title argument.[7] *See United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924) ("[A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought there by appeal of the adverse party."); 5 AM. JUR. 2D *Appellate* § 295 (2008) ("A party who does not cross-appeal from a judgment of a federal district court generally cannot oppose the final judgment on appeal or attack it with a view of enlarging its own rights or lessening the rights of the party's adversary."). The Court, therefore, denies the ART Entities' motion to amend their complaint to now add allegations supporting their alternate theories for termination. *See United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004) (holding that the "mandate rule" precludes parties from relitigating on remand "issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court").

---

[7]Even if the ART Entities had advanced fraud-based justifications for "termination" during the trial before Judge Buchmeyer, the jury at least implicitly rejected any such argument. It is undisputed that the jury found against the ART Entities on their independent fraud claims – a result which neither party appealed and which, therefore, remains decided against the ART Entities. Accordingly, even if the ART Entities did not waive these arguments by failing to advance them before Judge Buchmeyer, the ART Entities instead waived them by failing to cross-appeal the jury's rejection of their fraud claims.

With no arguments left to excuse the ART Entities' failure to go through with the deal, the Court concludes that the ART Entities "defaulted" pursuant to section 18(a) of MA. Therefore, the Court holds that, per the terms of section 18(a), the Clapper Entities are entitled to the Deposit. Accordingly, the Court grants summary judgment in the Clapper Entities' favor on Counts I and IV of their counter-complaint. The Court further grants in part the Clapper Entities' motion to compel, to which the ART Entities failed to respond and therefore the Court treats as unopposed. The Court orders the ART Entities to deposit the $250,000 they withdrew from escrow following trial, plus interest, into the registry of the Court pending final disposition of this action. The Court also denies that motion in part to the extent it requests attorneys' fees, as the Clapper Entities cite no authority for such an award.

### V. THE FAC&E AGREEMENT SURVIVES THE ART ENTITIES' DEFAULT AND DICTATES THAT THE INDIANA APARTMENTS BELONG TO THE PARTNERSHIP "FREE AND CLEAR"

The Court next holds that the FAC&E Agreement survives the ART Entities' default and dictates that the Partnership now owns the Indiana Apartments "free and clear" of any claim for further compensation by the Clapper Entities  The FAC&E Agreement unambiguously states that it controls the fate of the Indiana Apartments in the event of a default or termination under the MA. Although the MA purports to set forth an all-or-nothing deal, the parties immediately abandoned this all-or-nothing stance when they entered into the FAC&E Agreement, which controls "notwithstanding anything to the contrary contained in the Master Agreement." Section 5 of the FAC&E Agreement sets forth the

parties' rights in the event that the parties close on the Indiana Apartments, but fail to follow through on the remaining properties.[8] Specifically, section 5(b) governs the situation where "all the other Contribution and Exchange Agreements are terminated by the Partnership as permitted by the Master Agreement, or by virtue of a default by the Partnership." In that situation, the Partnership first has the right to pay the balance owed on the Indiana Apartments and keep them. If the Partnership does not elect to pay the remaining balance,

---

[8]The ART Entities' argument that the MA default/termination provisions override section 5 of the FAC&E Agreement is simply without merit. It is black letter contract law that later agreements control earlier ones, *see Sargent v. Highlite Broadcasting Co.*, 466 S.W.2d 866, 868 (Tex. Civ. App. – Austin 1971, no writ)("The right of renegotiation is inherent in any contract."), and that specific provisions control general ones, *see Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.*, 194 S.W.3d 723, 726 (Tex. App. – Dallas 2006, pet. denied) ("[S]pecific provisions control over general provisions . . . ."); *Eskew v. Cornett*, 744 N.E.2d 954, 957 (Ind. App. 2001) ("When a contract contains general and specific provisions relating to the same subject, the specific provision controls."). Courts have also held that when contracting parties use the clause "notwithstanding anything to the contrary" they "contemplate the possibility that other parts of their contract may conflict . . . , and they agree that this paragraph must be given effect regardless of any contrary provisions." *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App. – Houston [14 Dist.] 2005, no pet.).

The ART Entities' interpretation would also improperly – and quite conveniently – render section 5(b), which squarely addresses the parties' rights in the circumstances of this case, totally meaningless. *See Eskew*, 744 N.E.2d at 957 ("[T]o ascertain and effectuate the intent of the parties . . . . requires that the contract be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless."); *Wells Fargo*, 794 S.W.3d at 726 ("[T]he interpretation of an agreement should not render any material terms meaningless."). Their interpretation also contradicts the trial testimony of Cooper Stuart, an ART principal involved in negotiating the agreements on the ART Entities' behalf, that once the parties entered into the FAC&E Agreement "[a]t that point in time the all-or-nothing was gone." Test. of Cooper Stuart, App. to Reply Br. to Def.'s Mot. For Summ. J., Ex. 7; *see also id.* ("Q: Okay. And [suppose ART defaults] for whatever reason not permitted or just decides not to close on the remaining six properties, Mr. Clapper could say you keep the two Indianapolis properties, and ART would have to keep them? A: That's right.").

Atlantic XIII then has the right to either (i) waive the remaining balance owed and let the Partnership keep the apartments "free and clear of any claim by" Atlantic XIII, or (ii) "repurchase" the Indiana Apartments by returning the compensation it received at the time of closing.

Here, it is undisputed that the Partnership never paid the remaining one-half of the cost of the Indiana Apartments and, instead, requested that Atlantic XIII return the Units it had already received. It is also undisputed that Atlantic XIII rejected the Partnership's request and did not return the Units that the Partnership tendered when the parties closed on the Indiana Apartments. Accordingly, the only remaining contingency dictates that, once Atlantic XIII elected not to return the Units it previously received at the closing, it waived the balance due on the Indiana Apartments and those apartments now belong to the Partnership "free and clear of any claim by" Atlantic XIII.

The Court, therefore, grants summary judgment against the ART Entities on Count I of their complaint. The termination provisions of the MA do not override section 5 of the FAC&E Agreement, which clearly states that it applies even when the remaining C&E Agreements have been terminated or abandoned through default. The Court further grants summary judgment against the Clapper Entities on Count III of their counter-complaint. The Clapper Entities are not entitled to the final half of the purchase price for the Indiana Apartments. Section 5(b) of the FAC&E Agreement states that, when the Partnership elected not to pay the balance due and Atlantic XIII elected not to return the compensation already

received, Atlantic XIII "waive[d] the balance" due on the Indiana Apartments, which the Partnership now own "free and clear" of any claim for the remaining balance.

## VI. THE COURT DENIES THE REMAINDER OF BOTH MOTIONS FOR SUMMARY JUDGMENT

The Court regrettably denies the remainder of both parties' motions for summary judgment, which concern the Clapper Entities' Counts V, VI, VII, VIII, IX, XI, XIII, XV, and XVII. These counts consist of claims against the ART Entities for breach of and/or interference with the FLLIA, the Assumption Agreement, and the Partnership Agreement. The parties devote only a relatively small portion of their briefing to the intricacies of these various agreements,[9] and to the extent they do address these claims, the parties tend to argue past one another. Given the current state of the briefing, the Court is simply unable to ascertain whether any party is entitled to judgment as a matter of law on those claims. Accordingly, the Court denies both motions to the extent they pertain to one of these nine claims. *See Celotex*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."). The Court, however, grants both Plaintiffs and Defendants leave to file an additional motion for summary judgment directed solely at these

---

[9]This is understandable, given the number of issues the parties had to address in their briefing.

remaining claims. The parties shall file these additional motions, if they choose to do so, within forty-five (45) days of the date of this Order.

### VII. THE CLAPPER ENTITIES' COSTS ON APPEAL ARE TAXABLE IN THE ORDINARY COURSE

Finally, the Court grants the Clapper Entities' motion to tax costs incurred on appeal. The ART Entities object to only one of the Clapper Entities' requested costs and, in their reply brief, the Clapper Entities concede the point. Accordingly, the Clapper Entities may submit a bill of costs in the ordinary course.

### CONCLUSION

For the reasons given above, the Court grants summary judgment in favor of the Clapper Entities with respect to Counts I and IV of their counter-complaint and against the Clapper Entities with respect to Counts II, III, X, XII, XIV, and XVI of their counter-complaint. The Court further grants summary judgment against the ART Entities with respect to Count I of their complaint. The Court denies both parties' motions for summary judgment with respect to Counts V, VI, VII, VIII, IX, XI, XIII, XV, and XVII of the Clapper Entities' counter-complaint.

The Court also denies the ART Entities' motion for leave to amend their complaint, grants in part the Clapper Entities' motion to compel, and grants the Clapper Entities' motion to tax costs incurred on appeal.

Signed August 15, 2008.

_____
David C. Godbey
United States District Judge