IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ART MIDWEST, INC., *et al.*, | § | |
| | § | |
| Plaintiffs/Counter-Defendants, | § | |
| | § | |
| v. | § | Civil Action No. 3:99-CV-2355-N |
| | § | |
| DAVID M. CLAPPER, *et al.*, | § | |
| | § | |
| Defendants/Counter-Plaintiffs. | § | |

## <u>ORDER</u>

This Order addresses the parties' additional cross-motions for summary judgment [603, 605]. For the reasons given below, the Court grants in part and denies in part both Plaintiffs/Counter-Defendants ART Midwest, Inc. ("ART Midwest") and American Realty Trust, Inc.'s ("ART") (collectively, the "ART Entities") motion for summary judgment and Defendants/Counter-Plaintiffs' David M. Clapper; Atlantic Midwest, LLC; Atlantic XIII, LLC; and other related entities' (collectively, the "Clapper Entities") motion for summary judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

A more complete statement of the factual and procedural background of this case is set forth in the Court's Order of August 15, 2008 (the "Aug. 15 Order"). The Court will briefly summarize that history for the purposes of this Order.

### A. Factual History

This action arises from the collapse of a partially-consummated sale of apartment complexes nearly a decade ago. The general goal of that real estate deal was the transfer of several groups of apartments from the Clapper Entities to the ART Entities.[1] On November 3, 1998, the parties entered into a number of agreements that set forth the core provisions of their planned transactions. One was a Master Agreement ("MA"), which served as the overarching backbone of the deal.[2] In addition, three Contribution and Exchange Agreements ("C&E Agreements"), each governing the sale of one or more apartment complexes located in a particular geographic region, set forth the details of each transaction.[3]

Through these agreements, the parties organized the transactions so an intermediate entity, ART Midwest L.P.[4] (the "Partnership"), would be the nominal buyer of all properties. The Partnership consisted of ART Midwest, as Managing General Partner; Atlantic Midwest, as Non-Managing General Partner; Atlantic XIII, as Limited Partner; and ART, as Limited Partner. According to the terms of the C&E Agreements, a subset of the Clapper Entities (the numbered Atlantic LLCs – e.g., Atlantic XIII) would transfer the various apartment

---

[1]As in the Aug. 15 Order, the Court refers to Plaintiffs/Counter-Defendants as the "ART Entities" and to Defendants/Counter-Plaintiffs as the "Clapper Entities," even though not every party in the real estate deal is now a party in this case.

[2]The MA is, by its own terms, governed by Texas law.

[3]Only two of the three C&E Agreements play a role in this case. Those two are the Indianapolis, Indiana C&E Agreement and the Toledo, Ohio C&E Agreement. They are governed by Indiana and Ohio law, respectively.

[4]ART Midwest L.P. was once a defendant in this case, but was dismissed by stipulation of the parties.

complexes to the Partnership in exchange for limited partnership units (the "Units"), worth a nominal value of $1 each.

Pursuant to the terms of the MA, the ART Entities fronted $5.5 million for various deposits before the deal was abandoned (collectively, the "Deposit"). This amount included a cash deposit of $500,000, which was placed in escrow, an initial $2 million promissory note to Clapper, and another $3 million in promissory notes to Clapper in exchange for twice extending the deal's closing date.

The MA also set forth a framework of remedies in the event either side walked away from the deal. These provisions distinguished between a "termination" and a "default," with each triggering different rights or obligations for the party walking away from the deal. Section 14(a) of the MA states that the ART Entities may "terminate" the entire transaction by backing out of any one of the C&E Agreements for any of a number of legitimate reasons, such as a title problem affecting one of the complexes. A "default" occurs when one side walks away from the transaction for any other reason. MA section 18(a) states that:

> If ART or the Partnership shall default in any of its obligations under this Agreement, any Contribution and Exchange Agreement or the Stratford Square Purchase Agreement, and the default continues beyond the notice and cure period set forth herein, the Partnership shall be deemed to have defaulted under all the Contribution and Exchange Agreements and the Stratford Square Purchase Agreement. In such case, the [Clapper] Entities, acting together, shall have the right, as the [Clapper] Entities' collective sole and exclusive remedy, to terminate all of the Contribution and Exchange Agreements, the Stratford Square Purchase Agreement and this Agreement, whereupon (i) the Escrow Agent shall pay the Deposit to Clapper, as agent for the [Clapper] Entities, and the [Clapper] Entities shall be entitled to retain the full amount of the Deposit, not as a penalty, but in liquidation of all damages suffered by the [Clapper] Entities . . . , and (ii) the [Clapper] Entities shall have no other remedy against ART or the Partnership for damages either at law or in equity.

ORDER – PAGE 3

MA § 18(a). Accordingly, standing alone, the MA provides that, if the Partnership "defaults" on any one of the C&E Agreements, the Partnership also defaults on all other C&E Agreements and forfeits the Deposit to the Clapper Entities as their "sole and exclusive remedy" for breach of those agreements.

In a confusing and largely unexplained turn of events, the parties went on immediately to amend the C&E Agreement between the Partnership and Atlantic XIII (the "Indiana C&E Agreement") on the same day the parties entered into the MA and the three C&E Agreements. This particular C&E Agreement (as amended, the "First Amended Contribution and Exchange Agreement" or "FAC&E Agreement") governed the sale of two apartment complexes located in Indianapolis, Indiana (the "Indiana Apartments"). As amended, the FAC&E Agreement provided for the transfer of the Indiana Apartments on an expedited basis – apparently so the ART Entities could make necessary repairs to one of the complexes before winter. According to its own terms, the FAC&E Agreement controls "notwithstanding anything to the contrary contained in the Master Agreement."

According to the terms of the FAC&E Agreement, the Partnership agreed to pay for the Indiana Apartments in two installments. The Partnership agreed to pay one-half of the total purchase price – that is, one-half of the total number of Units owed – when the parties closed on the FAC&E Agreement and transferred the Indiana Apartments. The remainder of the purchase price (in Units) would not become due until the parties transferred the remaining apartment complexes (according to the unmodified and nonexpedited terms of the

remaining two C&E Agreements). The parties closed on the Indiana Apartments on November 19, 1998.

The FAC&E Agreement's terms also dictate the parties' rights in the event one side or the other abandoned the deal after the Indiana Apartments were transferred, but before the remaining properties were transferred. According to FAC&E Agreement section 5(b):

> If and in the event all the other Contribution and Exchange Agreements are terminated by the Partnership as permitted by the Master Agreement, or by virtue of a default by the Partnership, then, as an initial matter, the Partnership may elect to pay the balance of the Consideration to Transferor . . . , in which event Transferor shall have no further interest in the Assets. Such election shall be made within ten (10) days after the date of termination of the other Contribution and Exchange Agreements . . . . If the Partnership does not elect to pay the balance of the Consideration, Transferor may elect within ten (10) days following the date of notice of non-election, either (1) to waive the balance of the Consideration, in which event the Partnership shall own the Assets free and clear of any claim by Transferor; or (2) repurchase the Assets by (i) returning the Units to the Partnership; (ii) causing the Partnership to be relieved of recourse under the First Lien Loans; and (iii) reimbursing the Partnership for fifty percent (50%) of the costs of any physical improvements to the Assets incurred by the Partnership from the Closing Date to the date of termination.

FAC&E Agreement § 5(b).

In addition to its expedited timing, transfer of the Indiana Apartments was complicated by a mortgage on one of the complexes. This mortgage was held by Inland Mortgage Corp. ("Inland"), with Atlantic XIII as the borrower and David Clapper as the guarantor. As a condition of the Indiana closing, the Partnership and ART Country Squire,

LLC ("ART Country Squire")[5] entered into a "First Lien Loan Indemnification, Assumption and Modification Agreement" ("FLLIA") with Clapper and Atlantic XIII in which the two entities agreed to indemnify and defend Clapper and Atlantic XIII against Inland.[6]

Following the Indiana closing and just before the two remaining C&E Agreements were scheduled to close, the Partnership sent a letter to Clapper purporting to "terminate" the Toledo, Ohio C&E Agreement because of a zoning issue, claiming that a nonconforming use constituted a title defect. The Partnership claimed that, as a result of this supposedly legitimate termination, all C&E Agreements were automatically terminated pursuant to MA section 14(a). The Partnership demanded return of the Deposit and requested that Clapper repurchase the Indiana Apartments. The Clapper Entities refused to release the Deposit and Atlantic XIII refused to return its Units.

The ART Entities failed to obtain financing to pay the Inland note prior to the Partnership's purported termination of the Toledo, Ohio C&E Agreement and, presumably, quit trying afterwards. When the note went into default, Inland foreclosed and brought suit in Indiana against the parties for the deficiency. When Atlantic XIII and Clapper tried to enforce the FLLIA, the Partnership and ART Country Squire filed petitions for bankruptcy in the Bankruptcy Court for the Northern District of Texas. Within four months of filing, the

---

[5]ART Country Squire was a limited liability company, whose sole member was the Partnership, and which was established for the purpose of purchasing certain Indiana apartments. *See* Assumption Agreement at 6, 10.

[6]The parties and Inland later entered into an "Assumption, Modification and Extension Agreement" (the "Assumption Agreement"), in which Inland consented to the transfer of the affected complex and agreed to extend the maturity date of its note.

ORDER – PAGE 6

bankruptcy court entered an agreed order dismissing the Partnership's bankruptcy.  ART

Country Squire's bankruptcy, as well as the bankruptcy of ART Concord East, L.L.C. ("ART

Concord East"), which entered bankruptcy at the same time, proceeded through almost seven

years of liquidation to closure.[7]

### B. Procedural History

When the Clapper Entities refused to return the Deposit and repurchase the Indiana

Apartments in response to the Partnership's purported termination of the entire deal, the ART

Entities brought this action.  The Clapper Entities countersued, alleging seventeen causes of

action for breach of and/or tortious interference with the multiple agreements that governed

the real estate deal and the parties' relationships, and corresponding declaratory judgment

claims.  After a trial before the Honorable Jerry Buchmeyer, the jury returned a verdict in

favor of the ART Entities on their declaratory judgment claim, finding that the ART Entities

properly terminated the deal and were entitled to the Deposit.  The jury found against the

ART Entities on their fraud claims.

The Clapper Entities appealed.  The ART Entities did not cross-appeal.  On appeal,

the Fifth Circuit reversed the jury verdict, holding that a legal nonconforming zoning use

does not render a title unmarketable and, therefore, does not provide a legitimate basis for

"terminating" the transaction under section 14 of the MA.  *ART Midwest, Inc. v. Clapper*,

242 F. App'x 130, 132 (5th Cir. 2007).

---

[7]*See* the dockets of *ART Country Squire, L.L.C. v. Reed*, No. 99-35754-BJH (Bankr.
N.D. Tex. Mar. 7, 2006); *ART Concord East, L.L.C. v. Reed*, No. 99-35755-BJH (Bankr.
N.D. Tex. Mar. 7, 2006).

On remand, the case was assigned to the undersigned for a new determination of liability and damages. The parties then filed cross-motions for summary judgment. In the Aug. 15 Order, the Court granted summary judgment in favor of the ART Entities on Counts II, III, X, XII, XIV, and XVI of the Clapper Entities' counter-complaint, and in favor of the Clapper Entities on Counts I and IV of their counter-complaint and on Count I of the ART Entities' complaint. Specifically, the Court held that the ART Entities defaulted pursuant to section 18(a) of the MA, thereby forfeiting the Deposit to the Clapper Entities. The Court ordered the ART Entities to return $250,000 of the Deposit, which they had withdrawn from escrow, plus interest, into the registry of the Court pending final disposition of this action. The Court also held that the FAC&E Agreement survived the ART Entities' default and controlled the fate of the Indiana Apartments upon that default. Because the Partnership chose not to pay the balance of units remaining on the Indiana Apartments, Atlantic XIII was left with two alternatives under section 5(b) of the FAC&E Agreement: to waive the balance owed or to repurchase the apartments. In the Aug. 15 Order, the Court held that Atlantic XIII had elected to waive the balance owed on the Indiana Apartments, allowing the Partnership to keep them free and clear of any claim by Atlantic XIII.

The Court denied summary judgment with respect to the remaining claims – Counts V, VI, VII, VIII, IX, XI, XIII, XV, and XVII of the Clapper Entities' counter-complaint – and granted both parties leave to file additional motions for summary judgment directed

solely at those claims.  With leave of the Court, the parties have now filed additional motions

for summary judgment addressing those claims.**[8]**

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admission on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and the moving party is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this

determination, courts must view all evidence and draw all reasonable inferences in the light

most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S.

654, 655 (1962).  However, courts need not sift through the record in search of triable issues.

*Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its

belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).  This can be through either traditional summary judgment proof establishing a fact,

or through a claim that there is no evidence of an issue essential to the nonmovant's case on

which the nonmovant bears the burden of proof at trial.  *Id.*  Once the movant has made this

showing, the burden shifts to the nonmovant to establish that there is a genuine issue of

material fact such that a reasonable jury might return a verdict in its favor.  *Matsushita Elec.*

---

[8]The cross-motions for summary judgment present an imposing array of legal questions for the Court to resolve.  If the Court were to order the discussion by number of dollars at issue, it would address Count XIII first.  *See infra* note 29.  Instead, the Court tries to discuss the issues in a logical sequence.

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  In doing so, the nonmovant may not rely on "naked assertions of an actual dispute" but instead "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case."  *In re Lewisville Props., Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) (citing *Anderson*, 477 U.S. at 255–56).  Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).  If the nonmoving party fails to make a showing sufficient to establish an element essential to its case, the Court must grant summary judgment.  *Celotex*, 477 U.S. at 322–23.

### III. SEVERAL OF THE CLAPPER ENTITIES LACK STANDING TO BRING SOME OF THE COUNTERCLAIMS AT ISSUE

The ART Entities allege that certain subsets of the Clapper Entities lack standing to bring several of the counterclaims at issue in the parties' cross-motions for summary judgment.[9]  Article III of the Constitution requires a plaintiff to have standing to pursue a legal claim.  *See Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319 (5th Cir. 1999).  At a minimum, Article III requires that "the plaintiff personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts."  *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 (5th Cir. 2007).  In addition, "'a plaintiff generally may not rest his claim to relief on the legal rights of third parties even if he has

---

[9]These issues are not merely academic.  A claim by Atlantic Midwest on behalf of the Partnership is not worth as much to Clapper as an individual claim.  Likewise a claim against ART Midwest, a subsidiary of ART, is not worth as much to Clapper as a claim against ART, the parent.

alleged injury sufficient to satisfy article III.'" *Ensley*, 171 F.3d 319 (quoting *O'Hair v. White*, 675 F.2d 680, 687 (5th Cir. 1982) (en banc)). Under both Indiana and Texas law, which govern the contracts at issue in this case, only parties to an agreement and intended third-party beneficiaries may sue to enforce the rights set forth in that agreement. *See Adv. Ground Sys. Eng'g, Inc. v. RTW*, 388 F.3d 1036, 1043 (7th Cir. 2004); *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 602 (5th Cir. 2000). To bring a claim as a third-party beneficiary requires "(1) a clear intent by the actual parties to the contract to benefit the third party, (2) a duty imposed on one of the contracting parties in favor of the third party, and (3) the necessity of performance of the terms of the contract in order to render a direct benefit to that third party." *Adv. Ground*, 388 F.3d at 1043 (citing *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001)); *see Kona*, 225 F.3d at 602 (stating that under Texas law, "it is well settled that a person who is not a party to a contract may nevertheless have standing to enforce the contract if it was made for that person's benefit"). The parties to a contract may include a provision explicitly precluding third-party beneficiary claims, which will defeat third-party claims that might otherwise have been allowed. *Adv. Ground*, 388 F.3d at 1043 (citing *Ind. Gaming Co. v. Blevins*, 724 N.E.2d 274, 278–79 (Ind. Ct. App. 2000)); *see Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 200 (S.D. Tex. 2008) (finding the unambiguous language of a contractual provision disclaiming third-party liability indicated the parties' specific intent to eliminate third-party beneficiary claims); *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) (same). A nonparty to a contract

bears the burden of demonstrating its status as a third-party beneficiary.  *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994); *Luhnow*, 760 N.E.2d at 628.

Only Atlantic XIII and the Partnership are parties to the Indiana C&E Agreement.  As a result, the ART Entities argue that only Atlantic XIII has standing to bring Count V.  *See* ART Br. in Supp. of MSJ [606] at 18; ART Br. in Resp. to Clapper MSJ [615] at 21.  Similarly, only Clapper, Atlantic XIII, the Partnership, and ART Country Squire were parties to the Indemnification Agreement.  As a result, the ART Entities also argue that because Atlantic XII is not a party to the Indemnification Agreement, Atlantic XII lacks standing to bring Count VI.  *See* ART Br. in Supp. of MSJ [606] at 23.  While the Clapper Entities dispute the ART Entities' other arguments regarding Counts V and VI, they do not argue that any of Clapper Entities that were not a party to the Indiana C&E Agreement or the Indemnification Agreement have standing to sue for breach of those agreements.[10]  Atlantic XIII is the only Clapper Entity with standing to bring a counterclaim in Count V for breach of the Indiana C&E Agreement.[11]  Accordingly, the Court dismisses the counterclaims in Count V other than those Atlantic XIII has asserted.  Atlantic XII lacks standing to bring a

---

[10]The Clapper Entities appear to have waived any argument asserting the standing of the other Clapper Entities by failing to respond to the ART Entities' argument on this point and by specifically asserting Atlantic XIII's rights without mentioning the other Clapper Entities.  *See* Clapper Resp. to ART MSJ [612] at 15.

[11]Where some, but not all of the Clapper Entities have standing to assert the counterclaims addressed in this Order, the Court will continue to refer to any applicable subset of the Clapper Entities as "the Clapper Entities," despite the fact that this Part disposes of several of the Clapper Entities' counterclaims for lack of standing.

counterclaim in Count VI because Atlantic XII was not a party to the Indemnification Agreement. Accordingly, the Court dismisses Atlantic XII's counterclaim in Count VI.[12]

Atlantic Midwest, Atlantic XIII, ART, and ART Midwest are parties to the Partnership Agreement. Neither Clapper nor Atlantic XII is a party to the Partnership Agreement. Additionally, the ART Entities argue that Clapper and Atlantic XII are not third-party beneficiaries of the Partnership Agreement and that, as a result, only Atlantic Midwest and Atlantic XIII have standing to bring Counts VIII, IX, XIII, XV, and XVII, which involve the Partnership agreement. *See* ART Br. in Supp. of MSJ [606] at 33; ART Br. in Resp. to Clapper MSJ [615] at 25–26; ART Reply in Supp. of MSJ [618] at 9.

The ART Entities argue that section 4.07 of the Partnership Agreement bars all third-party beneficiary claims under the Partnership Agreement. *See* ART Br. in Resp. to Clapper MSJ [615] at 26. The Clapper Entities argue that section 4.07 prevents creditors and third parties, but not "affiliates" from suing the ART Entities to enforce obligations under the

---

[12]Standing does not appear to be at issue with respect to Counts VII or XI. Clapper, Atlantic XIII, ART, ART Country Squire, and Inland were party to the Assumption Agreement at issue in Count VII. Atlantic XIII and ART are party to the Exchange & Registration Rights Agreement at issue in Count XI. Although Count VII states that the ART Entities are liable to Atlantic XII in addition to Clapper and Atlantic XIII, the Clapper Entities implicitly concede that only Clapper and Atlantic XIII have standing to bring this counterclaim. In the Clapper Entities' motion for summary judgment, only "Clapper and Atlantic XIII request[ed] that the Court grant summary judgment as to Count VII." Clapper Br. in Supp. of MSJ [604] at 13. Accordingly, in the Court's discussion of Count VII *infra*, "the Clapper Entities" refers to Clapper and Atlantic XIII only. Likewise, only Atlantic XIII specifically requests relief in Count XI and the Clapper Entities' briefing evidences their understanding that only Atlantic XIII has a counterclaim against the ART Entities in Count XI.

Partnership Agreement.  *See* Clapper Resp. to ART MSJ [612] at 27.  Section 4.07 of the

Partnership Agreement states, in relevant part:

> <u>No Third Party Beneficiary</u>.  *No creditor or other third party* having dealings with the Partnership shall have the right to enforce the right or obligation of any Partner to make Capital Contributions, Additional Capital Contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that *the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and assigns.*

Partnership Agreement § 4.07 (emphasis added).

Clapper and Atlantic XII proceed on their counterclaims for breach of the Partnership

Agreement under a third-party beneficiary theory, arguing that promises in the Partnership

Agreement were made for their benefit and that their status as "affiliates," a defined term

under the Partnership Agreement, removes them from the application of section 4.07, which

expressly states that only parties to the Partnership Agreement are entitled to enforce its

provisions.  *See* Counter Complaint at 15; Clapper Resp. to ART MSJ [612] at 27.  But,

"[t]he fact that a person is directly affected by [contracting] parties' conduct, or that he may

have a substantial interest in a contract's enforcement, does not make him a third-party

beneficiary." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 362 (5th Cir. 2003)

(citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermed., S.A.S.*,

269 F.3d 187, 196 (3d Cir. 2001)).  The Clapper Entities do not point to anything "clearly

written or evidenced" in the Partnership Agreement that would indicate the parties intended

to make Clapper or Atlantic XII third-party beneficiaries of the Partnership Agreement or

that the parties intended section 4.07 to exclude only nonaffiliate creditors and third-parties.

ORDER – PAGE 14

*See Bridas*, 345 F.3d at 362 (quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1076 (5th Cir. 2002)).  Instead, section 4.07 expressly states that the parties did not intend any nonparty to be a third-party beneficiary or to be able to enforce the Partnership Agreement.  Accordingly, Clapper and Atlantic XII lack standing to bring the counterclaims in Counts VIII, XIII, or XV for breach of the Partnership Agreement, Count IX for breach of fiduciary duties under the Partnership Agreement, or Count XVII for a declaratory judgment to determine the parties' rights under the Partnership Agreement.[13]

Although the ART Entities do not specifically challenge Atlantic XIII's standing, and Atlantic XIII has standing to bring most of its counterclaims involving the Partnership Agreement, the Court sua sponte notes that Atlantic XIII lacks standing to bring a counterclaim in Count XIII for breach of section 4.02(d) of the Partnership Agreement.  As discussed below in subpart VIII(A), Section 4.02(d) allegedly imposes an obligation on ART to make certain capital contributions to the Partnership.  Because any obligation under section 4.02(d) is owed to the Partnership, claims for breaching section 4.02(d) belong to the Partnership, not to its individual partners.  *See Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 251 (Tex. App. – Dallas 2005, no pet.) (citing *Mendenhall v. Fleming Co.*, 504 F.2d 879, 881 (5th Cir. 1974)).  As a limited partner, Atlantic XIII does not have standing to bring

---

[13]The Court's review of the Clapper Entities' counter-complaint indicates that only Atlantic XIII seeks relief in Count XV for breach of section 4.02(c) of the Partnership Agreement, regarding dividends Atlantic XIII alleges it should have received under the Partnership Agreement.  And, only Atlantic Midwest, a general partner, seeks declaratory relief in Count XVII to determine the parties' rights under the Partnership Agreement.  These parties have standing to assert those counterclaims.

a direct action on behalf of the Partnership.  *See Nauslar*, 170 S.W.3d at 250 (holding partners have no "separate, individual right of action for injuries to the partnership that diminished the value of their ownership interest in the entity") (citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990)).    Accordingly, the Court dismisses Atlantic XIII's counterclaim in Count XIII for breach of section 4.02(d) of the Partnership Agreement.[14]

## IV. RES JUDICATA DOES NOT BAR ANY OF THE CLAPPER ENTITIES' COUNTERCLAIMS

The Court rejects the ART Entities' argument that res judicata bars the Clapper Entities' counterclaim in Count VI for breach of the Indemnification Agreement and in Count VII for breach of the Assumption Agreement.  According to the ART Entities, a Michigan court supposedly already entered a final judgment involving the same parties and claims at issue in Counts VI and VII.  *See* ART Br. in Resp. to Clapper MSJ [615] at 25, 34.

Federal courts apply the preclusion law of the state that rendered judgment.  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 248 (5th Cir. 2002); *see* 28 U.S.C. § 1738.  Accordingly, Michigan preclusion law applies to determine whether res judicata bars this counterclaim. Under Michigan law, a judgment is res judicata when "'parties have fully litigated a

---

[14]As a general partner of the Partnership, Atlantic Midwest has standing to bring Count XIII on behalf of the Partnership.  *See Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 159 n.13 (S.D. Tex. 2003) (assuming without discussion that a general partner has standing to sue in that capacity on behalf of a limited partnership); *see also Westfall v. State*, 10 S.W.3d 85, 89 (Tex. App. – Waco 1999, no pet.) (assuming without deciding that a general partner has standing to complain regarding the rights of a limited partnership) (citing *Nw. Otolaryngology Assocs. v. Mobilease, Inc.*, 786 S.W.2d 399, 404 (Tex. App. – Texarkana 1990, writ denied) ("A limited partnership acts only through its general partner.")).

particular claim and a final judgment has resulted.'" *Chakan v. City of Detroit*, 998 F. Supp.

779, 782 (E.D. Mich. 1998) (citing *VanDeventer v. Mich. Nat'l Bank*, 432 N.W.2d 338,

341–42 (Mich. Ct. App. 1988)).  The ART Entities have not provided the Court with or

directed the Court to any final judgment resulting from the litigation in Michigan.[15]

Accordingly, res judicata does not bar the Clapper Entities' counterclaims for breach of the

Indemnification Agreement or the Assumption Agreement.

## V. THE ART ENTITIES ARE NOT LIABLE FOR TORTIOUS INTERFERENCE

The Court grants summary judgment in favor of the ART Entities on all the Clapper

Entities' counterclaims for tortious interference because both ART and ART Midwest were

either party to the agreements at issue, and therefore not liable for tortiously interfering with

them, or were justified to interfere with them due to a financial interest in the subject of those

agreements.  In this Part, the Court specifically addresses the Clapper Entities' counterclaims

in Counts V, VI, VII, and VIII for tortious interference with section 3.2 of the Indiana C&E

Agreement, the Indemnification Agreement, and the Assumption Agreement, which are

governed by Indiana law, and with sections 6.01, 6.11, and 4.01 of the Partnership

Agreement, which is governed by Texas law.  To the extent the Clapper Entities have

---

[15]The "final judgment" entered in May 2006, to which the ART Entities and the Clapper Entities refer, does not appear to be a final judgment at all.  The ART Entities provided the Court a copy of the judgment to which they refer and the opinion on appeal in that case, which "[a]ffirmed in part, reversed in part, and remanded for further proceedings." *See* ART App. to Resp. to Clapper MSJ [616] at 8–15.  The ART Entities also note that the Michigan Supreme Court denied leave to appeal the court of appeals' decision. *See id.* at 16. Because the court of appeals remanded part of the case for further proceedings, none of these filings is a final judgment.

asserted counterclaims that they have not withdrawn in Counts XI, XIII, or XV for tortious interference with the Exchange & Registration Rights Agreement or sections 4.02(d) and (c) of the Partnership Agreement, the Court also grants the ART Entities' motion for summary judgment with respect to those counts for the same reasoning set forth in this Part.

The elements of a claim for tortious interference with contract under Indiana law are: "1) existence of a valid and enforceable contract, 2) defendant's knowledge of the contract's existence, 3) defendant's intentional inducement of the contract's breach, 4) absence of justification, and 5) resulting damages." *Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600 (Ind. App. 1993); *see Flintridge Station Assocs. v. Am. Fletcher Mortgage Co.*, 761 F.2d 434, 440 (7th Cir. 1985). Additionally, a party to an agreement is not liable for tortiously interfering with its own agreement. *Kiyose v. Trs. of Ind. Univ.*, 333 N.E.2d 886, 891 (Ind. App. 1975). *But see Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 n.7 (Ind. 1994) [hereinafter *Winkler II*] (agreeing with *Kiyose*, but noting that a party to an agreement may be liable for conspiring with another to tortiously interfere with the agreement).

The elements of a claim for tortious interference with contract under Texas law are: "'(1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage, and (4) actual damage or loss occurred.'" *Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1194 (5th Cir. 1985) (quoting *Diesel Injection Sales & Servs. v. Renfro*, 656 S.W.2d 568 (Tex. App. – Corpus Christi 1983, writ ref'd n.r.e.)). "[A] party cannot tortiously interfere with its own contract." *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995).

ORDER – PAGE 18

### A. The Partnership Agreement (Count VIII)

The ART Entities are not liable for tortiously interfering with sections 6.01, 6.11, or 4.01 of the Partnership Agreement.[16]  Both ART and ART Midwest are parties to the Partnership Agreement and as such, cannot be held liable for tortiously interfering with any part of that agreement.  *Id.*  Accordingly, the Court grants summary judgment in favor of the ART Entities on the Clapper Entities' counterclaims in Count VIII for tortious interference with the Partnership Agreement.

### B. The Indiana Agreements (Counts V, VI, and VII)

The ART Entities argue that they cannot be held liable for tortiously interfering with the Indiana C&E Agreement, the Indemnification Agreement, or the Assumption Agreement because their financial interest in those agreements justified any alleged interference and bars the Clapper Entities' counterclaims for tortious interference.  The Clapper Entities argue that the ART Entities cannot simultaneously claim that they are not parties to the Indiana C&E Agreement and the Indemnification Agreement, and that their superior financial interest in those agreements justifies interference with them.  *See* Clapper Resp. to ART MSJ [612] at 13, 21.  However, the Clapper Entities entered into those agreements with the Partnership, not with the ART Entities, so any claim for breach would have been against the Partnership.

---

[16]The Clapper Entities clarify and concede in their reply to their own motion for summary judgment, [617] at 3, that at least with respect to Count VIII, they are alleging a counterclaim for tortious interference only against ART and not against ART Midwest.  In an attempt to maintain an orderly record and account for the many counterclaims in this case, the Court nevertheless finds it useful to address each such possible counterclaim, which one or more parties has suggested as an issue before the Court in their second cross-motions for summary judgment.

And, despite the fact that the ART Entities were not parties to the Indiana C&E Agreement or the Indemnification Agreement, and ART Midwest was not a party to the Assumption Agreement, the ART Entities have a legitimate financial interest in the subject of those agreements, which justifies their alleged interference and entitles them to summary judgment on the Clapper Entities' counterclaims for tortious interference with those agreements. Because both sides agree that ART was a party to the Assumption Agreement, ART is also entitled to summary judgment on the Clapper Entities' counterclaim in Count VII for tortious interference with the Assumption Agreement. *See Kiyose*, 333 N.E.2d at 891 (noting that a party to a contract is not liable for tortiously interfering with its own contract).

The Indiana Supreme Court looks to the Restatement (Second) of Torts (the "Restatement") to determine whether conduct allegedly interfering with a contract is legally justified. *See Winkler II*, 638 N.E.2d at 1235; *Allison v. Union Hosp. Inc.*, 883 N.E.2d 113, 118 (Ind. App. 2008). The Restatement identifies several factors courts should consider in determining whether interfering conduct is legally justified: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of those interfered with, (4) the interests the actor seeks to advance, (5) the social interests in protecting the actor's freedom and the other party's contractual interests, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. *Winkler II*, 638 N.E.2d at 1235 (citing RESTATEMENT (SECOND) OF TORTS § 767 (1977)). "[T]he weight to be given to each consideration may differ from case to case depending upon the factual circumstances, but the overriding question is whether the [actor's] conduct has been fair and reasonable under the

ORDER – PAGE 20

circumstances." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 767 cmt. j (1977)).

Unfortunately, these factors do not squarely address the situation here, where one entity is

alleged to have tortiously interfered with another, related entity.[17]  Additionally, unlike many

jurisdictions, Indiana law has not developed a specific financial interest privilege that applies

in such cases.[18]  However, the caselaw that exists indicates that Indiana does or would

recognize a financial interest privilege and that the Court may rely on cases from other state

and federal jurisdictions that also follow the Restatement and have more fully developed a

financial interest privilege. *See Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d

1268, 1273 n.3 (Ind. App. 2000) ("A party is justified in interfering with a third party's

contract if it 'assert[s] in good faith a legally protected interest of [its] own . . . if the actor

believes that [its] interest may otherwise be impaired or destroyed by the performance of the

contract or transaction.'") (alteration in original) (citing RESTATEMENT (SECOND) OF TORTS

§ 773 (1979)); *see also Winkler II*, 638 N.E.2d at 1235 (relying on the Restatement and on

the supreme courts of other states that have considered the factors set forth in the

Restatement, including Alabama, Arizona, Illinois, Kansas, Massachusetts, and Montana).

---

[17]Here, the Clapper Entities allege that ART and its wholly-owned subsidiary, ART Midwest, tortiously interfered with the contract of a related entity, the Partnership.  The parties do not dispute that ART was a limited partner and ART Midwest was a general partner of the Partnership.  *See* Partnership Agreement at 1.

[18]For example, the District of D.C. has succinctly explained the financial interest privilege: "A person with a financial interest may safely interfere with a contract if 'his purpose is to protect his own interests and if he does not employ improper means.'" *Temps & Co. v. Finova Mezzanine Capital, Inc.*, 2001 WL 503249, at *1 (D.D.C. May 9, 2001) (citing 86 C.J.S. TORTS § 44; RESTATEMENT (SECOND) OF TORTS §§ 767, 769 (1977)) (other citations omitted).

In *Sangston v. Ridge Country Club*, the Seventh Circuit noted that when those in charge of a company decide that breaching a contract is in the best interests of that company, "courts have consistently refused to subject the people who induced the breach to liability in tort." 1994 WL 487303, at *8 (7th Cir. Sept. 6, 1994) (holding a club shareholder's alleged interference with a club contract was privileged because a shareholder may exercise its prerogative to influence the direction of its club) (citing *Deauville*, 756 F.2d at 1196 (explaining that under Texas law, "a plaintiff cannot recover for tortious interference with contract . . . if the allegedly interfering party acted to protect his own legitimate interest," including a financial interest such as stock ownership, which is "superior to that of one of the parties to the contractual or business relationship") and *Swager v. Couri*, 395 N.E.2d 921, 927 (Ill. 1979) (holding that under Illinois law, an officer, director, or shareholder of a corporation is not liable in tort for interfering with the corporation's contractual relations so long as the actor has a proper business purpose and good faith and does not act without justification or with malice)); *see also Prince v. Zazove*, 959 F.2d 1395, 1397, 1400 (7th Cir. 1992) (noting that under Illinois law, "a party who interferes with another party's contract is nonetheless privileged from liability where the party acts 'to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights involved'" and to overcome the privilege, the plaintiff must prove actual malice," i.e., "that the defendant acted with a desire to harm unrelated to the interest that the defendant was

presumably seeking to protect").[19]  In *Sangston*, the Seventh Circuit further states that, at least under Illinois law, corporate "officers, directors, shareholders or even managers" are privileged "to exercise business judgment to dissolve [a] contract, without facing liability in tort."  1994 WL 487303, at *8–9; *cf. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77–79 (Tex. 2000) (noting that a third party generally has no cause of action against an agent for inducing its principal to breach a contract because an identity of interests exists between the agent and principal, and implying that identity of interests between parties provides justification for interference).

In *Deauville*, on which the Seventh Circuit relies in *Sangston*, the Fifth Circuit explained that usually, but not always, a parent company is privileged against claims for tortiously interfering with the contractual relationships of its subsidiaries because the interests of the two are so closely aligned as to eliminate their separate identity, and because

---

[19]Indiana law is inconsistent on the question of whether a claimant must prove actual malice or ill will to succeed on a claim for tortious interference with contract.  *See, e.g.*, *Allison*, 883 N.E.2d at 120 (holding that actual malice or ill will is not required and that it is enough to establish that the actor "knew of the existence of a valid and binding [c]ontract," and "acted without reasonable justification or excuse.").  *But see, e.g.*, *Bilimoria Computer Sys., LLC v. Am. Online*, 829 N.E.2d 150, 156–57 (Ind. App. 2005) (holding absence of justification is established only "if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another").  One Seventh Circuit case interpreting Indiana law helps to resolve this discrepancy by defining "unjustified" in part as "disinterested malevolence."  *See Flintridge*, 761 F.2d at 441.  The Restatement indicates that in the context of claims for tortious interference, "malice" or "ill will" merely means "intentional interference without justification."  RESTATEMENT (SECOND) OF TORTS § 766 cmt. s (1979).  Among other reasons, the Court finds this comment worth noting because it negates the Clapper Entities' contention that malice has nothing to do with justification or privilege against tortious interference counterclaims.

the parent acts to protect its own legitimate financial interests.  *See* 756 F.2d at 1196.[20]  In

addition to the Seventh Circuit in *Sangston*, several other circuits have reached the same

conclusion.  *See, e.g.*, *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d

Cir. 1995); *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 601 (6th Cir.

1988).[21]  The same reasoning may be applied with equal force here, where partners are

alleged to have interfered with the contract of their Partnership.  *See Gulickson v. Forest*, 290

F. Supp. 457, 468 (E.D.N.Y. 1968) (citing *Braden v. Perkins*, 22 N.Y.S.2d 144, 145 (N.Y.

Sup. Ct. 1940)).

    Because the ART Entities are partners in the Partnership, they are intimately

interested in and affected by its agreements, including the Indiana C&E Agreement and the

––––––––––––––––––––

[20]In *Copperweld Corp. v. Independence Tube Corp.*, the Supreme Court held that "the
coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of
a single enterprise for purposes of § 1 of the Sherman Act."  467 U.S. 752, 771 (1984).
*Deauville* is among a line of cases that developed following *Copperweld* and holding that
when there is sufficient identity of interest, an interested third party that might otherwise be
liable for tortiously interfering with a contract is protected from liability for inducing its
breach.  *See also Kentuckiana Med. Ctr. LLC v. Clark Cty.*, 2006 WL 146625, at *5 n.14
(S.D. Ind. Jan. 18, 2006) (declining to undertake an extensive analysis of *Copperweld*, but
recognizing the possibility that *Copperweld*'s reasoning could apply where a unity of interest
was alleged among a county hospital and its parent county (citing *Copperweld*, 467 U.S. at
771) ("[A] parent and its wholly owned subsidiary have a complete unity of interest[, and
t]heir objectives are common, not disparate; their general corporate actions are guided or
determined not by two separate corporate consciousness, but one.")).

    [21]The Sixth Circuit, at least, has noted an exception to this privilege generally exists
when the parent uses "wrongful means" or "an improper purpose."  *See Speroni S.p.A. v.
Perceptron, Inc.*, 12 Fed. Appx. 355, 360 (6th Cir. 2001) (citing *Boulevard Assocs.*, 72 F.3d
at 1037; *T.P. Leasing Corp. v. Baker Leasing Corp.*, 732 S.W.2d 480, 483 (Ark. 1987)).
That exception seems to be limited to instances where interfering parties act "for their own
benefit with no benefit to the corporation."  *Speroni*, 12 Fed. Appx. at 360 n.4 (citing several
Michigan cases).

Indemnification Agreement, both of which ART Midwest signed on behalf of the Partnership. The Indiana C&E Agreement and the Indemnification Agreement reference and rely on ART's responsibilities under the MA and other related agreements. C&E §§ 3.2(a), 7.3(j); Indemnification Agreement § 3. The Indiana C&E Agreement also contemplates that Atlantic XIII and other of the Clapper Entities had duties and rights with respect to the ART Entities in addition to their duties to the Partnership. *See, e.g.*, C&E §§ 3.2(a), 7.3(j); *see also* Clapper Reply in Supp. of MSJ [617] at 27. ART's participation in the Assumption Agreement is sufficient to establish ART Midwest's financial interest as ART's wholly-owned subsidiary.

The Court holds that, due to the ART Entities' financial interest in the subject of the agreements, their alleged interference was justified. Accordingly, the ART Entities are not liable for tortiously interfering with the Indiana C&E Agreement, the Indemnification Agreement, or the Assumption Agreement. The Court therefore grants summary judgment in favor of the ART Entities on the Clapper Entities' counterclaims in Counts V, VI, and VII for tortious interference with the Indiana C&E Agreement, the Indemnification Agreement, and the Assumption Agreement.

## VI. SECTION 18(a) OF THE MA APPLIES TO CLAIMS FOR BREACH OF ONLY THE MA, C&E AGREEMENTS, AND STRATFORD SQUARE PURCHASE AGREEMENT

### A. General Applicability

The ART Entities argue that the damages provision set forth in the MA encompasses all the agreements at issue in the Clapper Entities' counter-complaint. If the ART Entities' argument were correct, the Deposit, along with interest and costs, would be the only remedy

to which the Clapper Entities would be entitled for all their counterclaims of breach.

However, the ART Entities are incorrect. By its terms, section 18(a) applies to only the MA,

the C&E Agreements, and the Stratford Square Purchase Agreement. MA section 18(a)

states that:

> If ART or the Partnership shall default in any of its obligations under this Agreement, any Contribution and Exchange Agreement or the Stratford Square Purchase Agreement, and the default continues beyond the notice and cure period set forth herein, the Partnership shall be deemed to have defaulted under all the Contribution and Exchange Agreements and the Stratford Square Purchase Agreement. In such case, the [Clapper] Entities, acting together, shall have the right, as the [Clapper] Entities' collective sole and exclusive remedy, to terminate all of the Contribution and Exchange Agreements, the Stratford Square Purchase Agreement and this Agreement, whereupon (i) the Escrow Agent shall pay the Deposit to Clapper, as agent for the [Clapper] Entities, and the [Clapper] Entities shall be entitled to retain the full amount of the Deposit, not as a penalty, but in liquidation of all damages suffered by the [Clapper] Entities . . . , and (ii) the [Clapper] Entities shall have no other remedy against ART or the Partnership for damages either at law or in equity.

MA § 18(a).[22]

With respect to the Partnership Agreement, the ART Entities further argue that

because section 25(m) of the MA incorporates by reference certain exhibits, including an

---

[22]Interestingly enough, the provisions of the Exchange & Registration Rights Agreement (the "Exchange Agreement") and the Partnership Agreement governing assignment of rights under the Exchange Agreement indicate that the parties to the Exchange Agreement could not have intended the damages provision of the MA to govern the Exchange Agreement. Those provisions contemplate that under certain circumstances, rights under the Exchange Agreement could be assigned or transferred to persons or entities who were not party to any of the agreements constituting the real estate deal that is the subject of this suit, e.g., certain inheritors, devisees, and investors. *See* Exchange Agreement § 4.4; Partnership Agreement § 9.02. Such persons or entities presumably would have been able to enforce their rights under the Exchange Agreement without regard to the damages provision of the MA. Likewise, Atlantic XIII can enforce its rights under the Exchange Agreement independently of the MA.

unsigned "Form of First Amended and Restated Agreement of Limited Partnership to be executed at the Closing,"[23] the MA's damages provision should apply to breach of the Partnership Agreement.  But, only a draft of and not the executed Partnership Agreement appears to have been incorporated into the MA and neither the MA nor its damages provision appears to have been incorporated into the later-signed Partnership Agreement.  Accordingly, the damages provision does not apply to the Indemnification Agreement, the Assumption Agreement, the Exchange & Registration Rights Agreement, or the Partnership Agreement.  As a result, the ART Entities' argument that the Deposit was the Clapper Entities' only available remedy for breach of those agreements is to no avail.

### B. Breach of the Indiana C&E Agreement Section 3.2 (Count V)

The ART Entities are entitled to entitled to summary judgment on Atlantic XIII's counterclaim in Count V for breach of the Indiana C&E Agreement section 3.2 because the Clapper Entities are unable to establish additional damages for breach of the Indiana C&E Agreement beyond the Deposit the Court already awarded the Clapper Entities for default

---

[23]Section 25 of the MA is titled, "Miscellaneous."  Section 25(m) reads, "Exhibits. The following exhibits are attached to this Agreement and are incorporated into this Agreement and made a part hereof: . . . Exhibit D Form of First Amended and Restated Agreement of Limited Partnership to be executed at the Closing."  ART attaches Exhibit D to the MA as Exhibit 1 to its second motion for summary judgment. See ART App. to MSJ [607-3] at 35–38, [607-4] at 1–46.  The exhibit ART submits is merely a draft of the Partnership Agreement, which, judged by its lack of references to the Early Closing Properties, was before the amendments undertaken to effect the early transfer of those properties.

or breach of the MA or "any Contribution and Exchange Agreement," including the Indiana C&E Agreement.  *See* MA § 18(a); Aug. 15 Order at 12.[24]

In the Aug. 15 Order, the Court held that the ART Entities "'defaulted' according to the terms of the MA" and held that the Clapper Entities are entitled to the Deposit provided for breaches of the MA and C&E Agreements.  *See* Aug. 15 Order at 3, 10.  At the time of signing the MA and the initial C&E Agreements, the parties quite plainly contemplated an "all or nothing" transaction.  *See* MA § 18(a).  The FAC&E Agreement is the only document before the Court that purports to modify the MA or any C&E Agreement in any way.  While the parties abandoned the "all or nothing" nature of the deal as initially contemplated, nothing in the FAC&E Agreement purports to modify section 3.2 of the Indiana C&E Agreement or the damage limitations provisions set forth in section 9.1(a) of the Indiana C&E Agreement and in section 18(a) of the MA, which by its terms also applies to any default under the C&E Agreements.  Instead, the FAC&E Agreement states only that it was to supercede potentially contradictory aspects of the MA or the Indiana C&E Agreement.  Otherwise, the FAC&E Agreement ratified and reconfirmed the Indiana C&E Agreement in all respects.  *See* FAC&E Agreement § 8 ("Except as and to the extent modified hereby, the [Indiana C&E] Agreement is hereby ratified and reconfirmed in all respects.").

Because the FAC&E Agreement did not modify section 3.2 of the Indiana C&E Agreement or the damage limitations provisions set forth in section 9.1(a) of the Indiana

---

[24]Section 9.1 of the Indiana C&E Agreement contains a damages clause almost identical to the one in the MA, which has the same effect on this counterclaim.

C&E Agreement and section 18(a) of the MA, that provision limits the Clapper Entities'
damages for breach of section 3.2 of the Indiana C&E Agreement to the Deposit, along with
interest and costs, as the Court already held. As a result, even if the ART Entities were
deemed parties to the Indiana C&E Agreement, which the ART Entities dispute, and even
if the ART Entities breached section 3.2 of the Indiana C&E Agreement, the ART Entities
are entitled to summary judgment on the Clapper Entities' Count V breach of contract
counterclaim against ART.

## VII. STATUS OF THE PARTNERSHIP AND ATLANTIC MIDWEST AS MANAGING GENERAL PARTNER (COUNTS XVI AND XVII)

Acting under the Court's pre-appeal rulings in this case, the ART Entities proceeded
for several years as if the Partnership had properly terminated the real estate deal that is the
subject of this action. Throughout that time, the Clapper Entities always maintained that the
purported termination was improper and ineffective and that the ART Entities had in fact
defaulted and breached multiple obligations to the Partnership and the Clapper Entities. The
Clapper Entities have also maintained that, based on uncured Partnership defaults, Atlantic
Midwest was entitled to become the managing general partner of the Partnership in 1999 and
that ART Midwest no longer had authority to act on behalf of the Partnership. Because the
ART Entities disagreed and, for a time, enjoyed the Court's approval of their position, ART
Midwest continued to act as managing general partner and, per the ART Entities' own
admission, "never allowed [Atlantic Midwest] to act as the Managing General Partner." *See*
ART Br. in Resp. to Clapper MSJ [615] at 32. The ART Entities proceeded in every other
way as if their version of reality was correct. But, according to the Fifth Circuit's opinion

ORDER – PAGE 29

in 2007, it is now evident that the Clapper Entities' version of reality was actually more correct. Now, the Court must attempt to unravel the legal consequences of the ART Entities' actions over the past decade, taken at the time in conformity with rulings the Fifth Circuit has now overturned, in view of the new reality.

### A. Atlantic Midwest Is the Managing General Partner of ART Midwest, LP (the Partnership)

Atlantic Midwest effectively elected to convert its position in the Partnership from Non-Managing General Partner to Managing General Partner on December 9, 1999. Section 7.05 of the Partnership Agreement provides, in relevant part:

> Conversion of Non-Managing General Partner to Managing General Partner. Upon (i) the Partnership's failure to distribute timely to the Class A Limited Partners [Atlantic XIII] the Quarterly Preferred Return in full on any Distribution Date, [or] (ii) the Partnership's default in any other obligation under this Agreement to the Class A Limited Partners . . . then, the Non-Managing General Partner may give written notice of such default to the Partnership, ART and BCM [Basic Capital Management, Inc.]. Each of ART, the Partnership and BCM has the right to cure such default within ten (10) Business Days after the date of such written notice. If ART, the Partnership and BCM each fail to exercise their respective right to cure [Atlantic Midwest] may, at its option, elect to convert its Non-Managing General Partnership Interest into the Managing General Partnership Interest. Upon such election, which shall be made in writing to ART Midwest, [Atlantic Midwest] shall become the Managing General Partner and the Managing General Partnership Interest of ART Midwest shall be automatically converted into a Class B Limited Partnership Interest and, thereafter, ART Midwest shall be a Class B Limited Partner without the requirement of any additional act. Upon such conversion, the term "Managing General Partner" shall be deemed to refer to [Atlantic Midwest] for all purposes of this Agreement, it being the intention of the parties hereto that upon such conversion [Atlantic Midwest] shall manage all business of the Partnership on a day-to-day basis, and ART Midwest shall have no participation in such management decisions.

Partnership Agreement § 7.05.

ORDER – PAGE 30

On November 18, 1999, Atlantic Midwest gave written notice to the Partnership, ART, and BCM of multiple Partnership defaults, including failure to distribute timely quarterly preferred returns to Atlantic XIII.  *See* Clapper Br. in Supp. of MSJ [604] Ex. 28. On December 9, 1999, after ten days business days had passed, and neither ART, the Partnership, nor BCM had cured any default, Atlantic Midwest elected in writing to convert its Non-Managing General Partnership interest into the Managing General Partnership interest.  *See id.* Ex. 27.  In view of the Fifth Circuit's decision in this case, Atlantic Midwest correctly understood its rights under the various agreements.  Upon its election, Atlantic Midwest became the Managing General Partner of the Partnership and ART Midwest's interest was automatically converted to that of a Class B Limited Partner without any of the rights, obligations, or powers with respect to the Partnership that Article VI of the Partnership Agreement vests exclusively in the Managing General Partner.  *See* Partnership Agreement Art. VI; *see also* Clapper Br. in Supp. of MSJ [604] at 17; Clapper Resp. to ART MSJ [612] at 3.

The ART Entities' only arguments to the contrary are first, that Atlantic Midwest's declaratory judgment claim seeks relief not requested or that was denied in a previous Order, and second, that ART cannot be held liable for debts, liabilities, contracts, or obligations in excess of its capital contributions.  ART Br. in Resp. to Clapper MSJ [615] at 43; ART Reply in Supp. of MSJ [618] at 18–19.  However, Atlantic Midwest specifically requested a declaratory judgment in Count XVI of its of its counterclaim and, although Count XVII is titled "Breach of Section 7.05 Under the Partnership Agreement," Atlantic Midwest's

summary judgment briefing demonstrates that it is actually seeking declaratory relief through this counterclaim as well.

The ART Entities are correct that the Court has previously denied relief to the Clapper Entities on their claim for declaratory relief that Atlantic Midwest was rightfully Managing General Partner of the Partnership; the Court is now of the opinion that it erred in so doing. Some explanation is required. The Clapper Entities structured a large part of their counterclaim as paired claims for declaratory judgment and breach of contract relating to various provisions of the various contracts at issue. In its Aug. 15 Order, the Court exercised its discretion not to consider the declaratory judgment claims and granted summary judgment in favor of the ART Entities on all the Clapper Entities' counterclaims for declaratory judgment, because the Court believed the breach of contract claims would more effectively and appropriately offer the relief the Clapper Entities were seeking. The Court took this action wholesale, without considering the details of any specific claim.

In retrospect, the question of which party is Managing General Partner appears to have greater consequence on an ongoing basis, e.g., in connection with winding down the Partnership, than it does retrospectively as a basis for money damages. Thus, as between Counts XVI (declaratory judgment) and XVII (breach), which are based on identical factual allegations and legal arguments regarding which party is entitled to be Managing General Partner, the counterclaim for declaratory judgment in Count XVI more effectively and appropriately offers the relief Atlantic Midwest seeks. Accordingly, the Court vacates its interlocutory grant of summary judgment on Count XVI and reinstates Atlantic Midwest's

ORDER – PAGE 32

claim for declaratory judgment that it is properly the Managing General Partner of the Partnership. The legal issues are fully addressed in the parties' briefing on Count XVII (breach), so the Court will address those legal issues, but in the context of a claim for declaratory relief, rather than a claim for money damages for breach.

The ART Entities' second argument is also unavailing because section 8.03 of the Partnership Agreement may limit ART's liability, but it does not speak to the status of the Partnership or Atlantic Midwest's present role in the Partnership. The relevant portion of section 8.03 states:

> Neither the Non-Managing General Partner [Atlantic Midwest] nor the Limited Partners [ART and Atlantic XIII] shall be liable for any debts, liabilities, contracts or obligations of the Partnership. [Atlantic Midwest, Atlantic XIII, and ART] shall be liable to the Partnership only to make payments of its Capital Contribution, if any, as and when due hereunder. After its Capital Contribution is fully paid, such Partners shall not, except as otherwise required by the Act or herein, be required to make any further Capital Contributions or other payments or lend any funds to the Partnership.

Partnership Agreement § 8.03.

Accordingly, the Court grants summary judgment in favor of Atlantic Midwest on its counterclaim in Count XVI for a declaratory judgment that on December 9, 1999, Atlantic Midwest became the Managing General Partner and, for reasons stated in the next subpart, remains the Managing General Partner of the Partnership.

### B. Though Dissolved, the Partnership Still Exists

#### 1. The Vacated June 2003 Judgment Does not Dissolve the Partnership. – The ART Entities argue that the judgment entered in this case in June 2003 retroactively dissolved the Partnership as of March 22, 1999. *See* ART Br. in Resp. to Clapper MSJ [615]. But, the

ORDER – PAGE 33

Fifth Circuit reversed that judgment in July 2007. The effect of that reversal is to render the prior judgment a nullity, including that part that ordered the Partnership dissolved.

The general common-law rule governing the effect of reversal on a judgment is that, after reversal, "[the] decree [is] no longer of any force or effect. The parties [are] in precisely the same situation as though no decree had been entered." *Kaplan v. Joseph*, 125 F.2d 602, 606 (7th Cir.1942). *See also Keller v. Hall*, 111 F.2d 129, 131 (9th Cir.1940) (quoting *Butler v. Eaton*, 141 U.S. 240, 244 (1891)) (a judgment, "after it was reversed, was 'without any validity, force, or effect.' "). As Justice Story explained, "[a]t common law, if a plaintiff obtain a judgment in an inferior tribunal, which is reversed in the appellate court, it is very clear, that the reversal operates no further, than to nullify the original judgment. In other respects, the parties are precisely the same situation, as to their rights and remedies touching the matter in controversy, as if no such judgment had ever existed." *Harvey v. Richards*, 11 F. Cas. 740, 745 (C.C.D. Mass.1814) (No. 6,182). Accordingly, when "the decision of the United States Circuit Court of Appeals [is] reversed by the Supreme Court . . . the reversal of [the] decree sets aside the adjudication of such decree and same becomes no longer of any force and effect. After the reversal the situation [is] as if no decree had been entered by the Circuit Court of Appeals." *National Nut Co. of Cal. v. Kelling Nut Co.*, 61 F. Supp. 76, 80 (N.D. Ill.1945). See also 36 C.J.S. *Federal Courts* § 712 (1955 & Supp. 2007) ("The effect of a general and unqualified reversal of a judgment, order, or decree by [a reviewing court] is to nullify it completely and to leave the cause standing as if it had never been rendered [.]") (collecting cases).

As a corollary of the rule that reversal of a judgment leaves the parties in the same position as if the judgment had never been entered, any judgment that is dependent upon the reversed judgment is reversed as well. "On the reversal of a judgment, order, or decree by the [reviewing court], a dependent order, judgment, or proceeding, ancillary and accessory to it, shares its fate and falls with it." 36 C.J.S. *Federal Courts* § 713 (collecting cases). *See also United States v. Standard Accident Ins. Co.*, 106 F.2d 200, 204 (7th Cir.1939) (on reversal of a judgment for a plaintiff on the ground that the verdict could not be reconciled with the evidence, a defendant's counterclaim, on which the jury had found against the defendant, was reinstated.). *Accord Universal Underwriters Ins. Co. v. McMahon Chevrolet-Oldsmobile, Inc.*, 866 F.2d 1060, 1063 (8th Cir.1989) (reversal of a judgment "effectively annul[s] the . . . judgment in toto," even as to issues not specifically addressed by the reviewing court but the resolution of which are necessarily dependent on the judgment); *Leader v. Apex Hosiery Co.*, 108 F.2d 71, 81 (3d Cir.1939) (the

> Supreme Court's reversal of a prior judgment of the court of appeals opened
> "anew all questions presented by the record of the case at bar"); *First Nat'l
> Bank v. Southern Cotton Oil Co.*, 86 F.2d 33, 33-34 (5th Cir.1936) (a prior
> reversal of a judgment for the appellants also vacated a judgment on costs);
> *Future Fashions v. American Sur. Co. of N.Y.*, 58 F. Supp. 36, 38 (S.D.N.Y.
> 1944) (where a temporary restraining order was made effective until the
> issuance of an injunction pendente lite and an order issuing the injunction
> pendente lite was reversed on appeal, reversal also determined that the plaintiff
> was not entitled to the temporary restraining order); 5 C.J.S. *Appeal and Error*
> § 1107 ("An order, judgment, or proceeding dependent on, or ancillary and
> accessory to, a judgment, order, or decree which is reversed falls with it.")
> (collecting cases).

*Disher v. Citigroup Global Markets, Inc.*, 486 F. Supp.2d 790, 798-99 (S.D. Ill. 2007)

(alterations in original).  *Accord Falcon v. Gen'l Tel. Co.*, 815 F.2d 317, 320 (5th Cir. 1987).

This Court ordered that the Partnership was dissolved in its judgment of June 25,
2003.  That was the same judgment reversed by the Fifth Circuit.  Although the Fifth
Circuit's opinion did not specifically discuss that portion of the judgment dissolving the
partnership, it was part and parcel of the same judgment that was reversed, and was ancillary
to the central aspect of that judgment that was specifically found to be error by the Circuit,
that is, that the ART Entities justifiably terminated the agreements because of a title defect.
In view of the Circuit's reversal of the prior judgment, the parties are presently before the
Court "in precisely the same situation as though no decree had been entered," "as if no such
judgment had ever existed," "as if it had never been rendered."  Therefore, any purported
dissolution resulting from the June 2003 judgment is no longer effective.

**2. The Certificate of Cancellation Does Not Dissolve the Partnership.** – The ART
Entities argue that the certificate of cancellation ART Midwest filed with the Texas
Secretary of State "confirms that [the] Partnership dissolved on March 22, 1999."  ART

ORDER – PAGE 35

Letter Brief of July 22, 2009.  According to section 2.03(a) of the Texas Revised Limited Partnership Act,[25] a certificate of cancellation serves to terminate a limited partnership in three events: (1) on the completion of winding up of the partnership; (2) when there are no limited partners; or (3) on a merger or conversion of the partnership.  TEX. REV. CIV. STAT. ANN. art. 6132a-1-2.03(a).  The parties appear to agree that the second and third events did not occur in this case.  However, they vigorously dispute whether winding up of the Partnership occurred.

In general, winding up is the "process of completing unfinished transactions and settling partnership affairs after dissolution." *United States v. Saks*, 964 F.2d 1514, 1525 (5th Cir. 1992). Section 8.06 of the Texas Revised Partnership Act requires a partnership in the process of winding up to apply its property, including partners' contributions, "to discharge its obligations to creditors, including, to the extent permitted by other applicable law, partners who are creditors other than in their capacities as partners."  TEX. REV. CIV. STAT. ANN. art. 6132b-8.06.  Further, the Partnership Agreement provides that upon dissolution of the Partnership, "the property and assets of the Partnership shall be liquidated or distributed to the Partners as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice, subject to and conditional upon compliance with applicable law." *See* Partnership Agreement § 10.01(b).  Because of this outstanding litigation, in which the

---

[25]Because the Partnership was formed before September 1, 2006 and has not elected to be governed by the Texas Business Organizations Code, it is governed by the Texas Revised Limited Partnership Act and the Texas Revised Partnership Act.  *See* TEX. BUS. ORGS. CODE ANN. § 402.003 (Vernon 2006).

Clapper Entities filed a supersedeas bond on March 24, 2004, after the Court's initial judgment and before the certificate of cancellation was filed on July 9, 2004, ART Midwest could not have completed the requisite winding up. *See Saks*, 964 F.2d at 1525 ("'[L]itigation of claims by and against partners is a part of the winding up.'") (quoting CRANE & BROMBERG, PARTNERSHIP 460 (1968)).

It is well established that a partnership is not terminated until the winding up process is complete. *See* TEX. REV. CIV. STAT. ANN. 6132b-8.02; *Saks*, 964 F.2d at 1524; *see also Woodruff v. Bryant*, 558 S.W.2d 535, 539 (Tex. Civ. App. – Corpus Christi, 1977, writ ref'd n.r.e.) ("[G]enerally when the partnership is dissolved, the partnership continues during the period of winding up until all preexisting matters are terminated. . . . It is only upon termination that the final partnership relationship ceases to exist."). This would appear to hold true when a certificate of cancellation is improperly filed prior to completion of a partnership's winding up. In *Porter v. Barnhouse*, the Iowa Supreme Court noted that the filing of a certificate of cancellation under Iowa Partnership law, which, like Texas law, is based on the Uniform Partnership Act, "is designed to protect third parties dealing with the partnership." 354 N.W.2d 227, 231 (Iowa 1984). Citing cases from several other jurisdictions, including Texas, that court also noted that "several courts which have considered the issue have concluded that such filing requirements are designed for the protection of third parties and do not affect the rights of the limited and general partners"). *Id.* (citing *Garrett v. Koepke*, 569 S.W.2d 568, 570 (Tex. Civ. App. – Dallas 1978, writ ref'd n.r.e.) ("The purpose of the filing requirements under the act is to provide notice to third

persons dealing with the partnership of the essential features of the partnership arrangement. . . . The nature and legal existence of a partnership does not depend upon any filing required by a statute.")) (other citations omitted); *cf. Meissel v. Finley*, 95 S.E.2d 186, 191 (Va. 1956) (holding that court ordered cancellation of a certificate of limited partnership after dissolution of the partnership "simply made the cancellation a matter of record and could no[t] have the effect the effect of destroying the agreement of the parties with respect to their conduct and obligations after the dissolution occurred").

Additionally, section 2.04(3) of the Texas Revised Limited Partnership Act requires a certificate of cancellation to be "signed by all general partners participating in the winding up of the limited partnership's affairs or, if no general partners are winding up the limited partnership's affairs, then by all non-partner liquidators, or, if the limited partners are winding up the limited partnership's affairs, by a majority in interest of the limited partners." TEX. REV. CIV. STAT. ANN. art. 6132a-1-2.04(3). Because ART Midwest was no longer the Managing General Partner of the Partnership when it filed a certification of cancellation on July 14, 2004, that certificate was filed without authority and was ineffective to terminate the Partnership. Because the certificate of cancellation was filed without authority, the Court orders revocation of that certificate.

**3. *The Eggs Can Be Unscrambled.*** – The ART Entities argue by analogy to the doctrine of equitable mootness, under which courts reviewing bankruptcy proceedings may recognize "that there is a point beyond which they cannot order fundamental changes in reorganization actions." *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994). As an initial

matter, the ART Entities were unable to point the Court to any authority applying the equitable mootness doctrine in a nonbankruptcy proceeding, nor has the Court found any such authority. Injecting that doctrine into ordinary civil cases would work mischief with the well-established rules regarding supersedeas, stays of judgment, and the like. The Court declines to extend the doctrine to nonbankruptcy cases.

Moreover, the policy behind the equitable mootness doctrine indicates that it does not ultimately support the ART Entities' position. "The test for [equitable] mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him." *Id.* After the ART Entities defaulted under the MA and obtained a judgment in their favor based on that default, the ART Entities purported to wind up the Partnership and filed a certificate of cancellation despite the fact that this case was on appeal to the Fifth Circuit and the Clapper Entities had filed a supersedeas bond. The finality of the initial judgment and the ART Entities' good faith reliance on it would seem rather tenuous on these facts. But even more than protecting a party's reliance on a judgment, the doctrine of equitable mootness "protects the interests of non-adverse third parties . . . who have acted in reliance upon the [bankruptcy] plan as implemented." *Id.* In holding that the Partnership was not dissolved on March 22, 1999 – the date the Partnership sent its letter purporting to terminate all agreements between the parties – the Court is not ordering any third party to return Partnership property, or otherwise disturbing the finality or conclusive effect of the judgment

of any other court that disposed of Partnership assets. Instead, following the Fifth Circuit's instruction, the Court is merely determining the fate of the Partnership itself, as it relates to the issue of liability and damages.

     ***4. The Foreclosure Dissolved the Partnership.*** – Pursuant to section 2.03(a)(iii) of the Partnership Agreement, an event requiring the winding up of the Partnership did occur on May 20, 2002, ninety days after Inland foreclosed on the apartments.[26]  Section 2.03(a)(iii) provides, in relevant part:

> <u>Term and Dissolution</u>.  (a) . . . [T]he Partnership shall be dissolved upon the first to occur of any of the following events: . . . (iii) The passage of 90 days after the sale or other disposition (other than an exchange), in either case for cash, of all or substantially all of the assets of the Partnership.

Partnership Agreement § 2.03(a)(iii).  Texas Limited Partnership Law provides: "In a partnership in which the partnership agreement provides for winding up on a specified event, winding up is required on: . . . the occurrence of the specified event, unless otherwise continued under Section 4.07."  TEX. REV. CIV. STAT. ANN. art. 6132b-8.01(c)(2).  An event requiring winding up of the Partnership occurred on May 20, 2002, ninety days after all or substantially all Partnership assets were disposed of as a result of the consent judgment and

---

[26]Although this argument was not raised in the cross-motions for summary judgment, the Court raised this issue by letter and gave the parties an opportunity to brief the issue.  *Cf. St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 435 (5th Cir. 2000) (holding a district court may enter summary judgment sua sponte if it provides the parties with at least ten days notice and an opportunity to respond).

decree of foreclosure, which the Marion Superior Court entered in favor of Inland on February 19, 2002.[27]

The Clapper Entities argue that the disposition of the Partnership's only two properties was not equivalent to the disposition of all or substantially all of the Partnership's assets. *See* Clapper Suppl. Brief [626] at 2. Although the Clapper Entities conclusorily assert that "the Partnership owns other assets," the only other asset the Clapper Entities identify is "a contract right to pursue ART for its failure to contribute assets to the Partnership." *See id.* at 4. While a cause of action may be an asset, the Partnership's retention of that asset does not necessarily equate to the retention of enough assets to say that the disposition of other assets was not the disposition of substantially all of the Partnership's assets. To interpret the phrase, "substantially all of the assets of the Partnership" in section 2.03(a)(iii) of the Partnership Agreement, the Court looks to analogous and persuasive interpretations of the phrase "substantially all assets," in similar contexts.

In the context of Texas corporate law, "[t]he test to be applied when ascertaining whether all or substantially all assets are about to be sold is not the amount or value of the assets disposed of, but rather the nature of the transaction, that is, is the sale in furtherance of the express object of the corporation." *Governing Bd. v. Pannill*, 561 S.W.2d 517, 525 (Tex. Civ. App. – Texarkana 1977, writ ref'd n.r.e.); *see also Cyrix Corp. v. Intel Corp.*, 803 F. Supp. 1200, 1211 (E.D. Tex. 1992) (citing case holding "sale of assets used in

---

[27]The Clapper Entities do not dispute that the ART Country Squire and ART Concord East apartments were disposed of, either by foreclosure, abandonment, or sale.

corporation's 'principal business' constituted sale of 'all or substantially all' of its assets" under Delaware law); *Rudisill v. Arnold White & Durkee, P.C.*, 148 S.W.3d 556, 560 (Tex. App. – Houston [14th Dist.] 2004, no pet. h.) (equating the disposition of "all or substantially all assets" under the Texas Business Corporations Act with the liquidation and cessation of business after the disposition).  In *Cyrix*, the court explained that it "must focus on the nature of the corporation and the effect of the transaction on its ability to carry out its purpose after the time of the transaction."  803 F. Supp. at 1211.

Similarly, in the context of Internal Revenue Code provisions distinguishing between certain corporate liquidations and reorganizations, the test for whether all or substantially all of an organization's assets have been disposed of is whether the organization has retained or sold the assets necessary to operate an ongoing business.  *See Smothers v. United States*, 642 F.2d 894, 897–900 (5th Cir. 1981) ("Courts therefore have invariably . . . focused on the operating assets of the business[,] the tangible assets actively used in the business when making the 'substantially all assets' assessment.") (citing 26 U.S.C. § 354(b)(1)(A)).

Neither the Clapper Entities nor the ART Entities have advocated any particular test for determining what constitutes "all or substantially all" of the Partnership's assets under the Partnership Agreement.  Using the functional approach described above to aid its determination, the Court holds that in this case, the disposition of the Partnership properties was the disposition of substantially all of the Partnership's assets.  According to section 3.01 of the Partnership Agreement:

> [t]he purpose and nature of the business to be conducted by the Partnership is
> (i) to acquire, own, manage, develop, lease, operate, sell and otherwise deal

ORDER – PAGE 42

> with real estate including, but not limited to, the Properties, (ii) to enter into any partnership, joint venture or other similar arrangement . . . and (iii) to do anything necessary or incidental to the foregoing, including, without limitation, refinancing the Properties or any substitution property.

Partnership Agreement § 3.01. Upon the disposition of all Partnership properties, the Partnership was no longer able to fulfill any of its purposes. The disposition was not in furtherance of any express object of the Partnership. Instead, it was a disposition of all assets used in the Partnership's principal and ongoing business. Although disposition of the Partnership properties did not foreclose any party's rights under the Partnership Agreement, or dispose of any cause of action belonging to the Partnership, the Partnership's retention of such asset or assets does not negate the disposition of substantially all Partnership assets.

Accordingly, the Court holds that the disposition of the Partnership properties was the disposition of substantially all of the Partnership's assets under section 2.03(a)(iii) of the Partnership Agreement. As a result, disposition of those assets was an event requiring winding up of the Partnership. Therefore, the Court will grant declaratory judgment that Atlantic Midwest, as the Managing General Partner, shall wind up any remaining business and affairs of the Partnership.

## VIII. BREACH OF THE PARTNERSHIP AGREEMENT

The elements of a claim for breach of contract under Texas law are: "(1) that a valid contract existed, (2) that the plaintiff performed or tendered performance, (3) that the defendant breached the contract, and (4) that the plaintiff was damaged as a result of the breach." *N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 121 (Tex. App. – Austin 2003, no pet.). The court's primary concern in construing a written contract "is to ascertain the true

intent of the parties as expressed in the written instrument." *Id.* (citing *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995)).  Unless the court determines that a contract is ambiguous, the court may not consider extrinsic evidence to contradict or vary the meaning of the contract.  *Nat'l Union*, 907 S.W.2d at 521.  Determining whether a contract is ambiguous and what the contract means are questions of law for the court.  *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  A contract that is susceptible of a definite legal meaning or interpretation is unambiguous.  *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).  Courts should construe an unambiguous contract as a matter of law, in accordance with the plain meaning of its express words.  *Id.*; *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985).  A contract that is susceptible of "two or more reasonable interpretations after applying the pertinent rules of construction . . . is ambiguous, which creates a fact issue on the parties' intent."  *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (citing *CBI Indus., Inc.*, 907 S.W.2d at 520; *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (1951)).

### A. The Clapper Entities Are Entitled to Summary Judgment that ART Breached Sections 4.02(d) and (c) of the Partnership Agreement (Counts XIII and XV)

Section 4.02(d) of the Partnership Agreement requires the Managing General Partner to obtain an appraisal of the apartments annually beginning two years after the Final Effective Date, and requires ART to contribute additional assets to the Partnership if the appraisal comes in below a certain specified value.  Count XIII of the Clapper Entities' counterclaim alleges that the ART Entities breached Section 4.02(d) by failing to obtain an

appraisal,[28] failing to contribute additional assets,[29] and wrongfully preventing the Final

Effective Date from ever taking place. Section 4.02(c) of the Partnership Agreement requires

ART to make certain payments to the Clapper Entities if the Partnership does not make

certain distributions. Count XV of the Clapper Entities' counterclaim alleges that ART

breached Section 4.02(c) by failing to make the required payments when the Partnership did

not make the specified distributions.

The ART Entities argue initially that their performance under Section 4.02(c) and (d)

was excused by Section 4.01. Section 4.01 provides in part: "If no additional Class A

Limited Partnership Units are issued after the Early Closing Date, references to the Final

Closing Date, Final Closing Properties, Final Closing Units, Final Effective Date and Final

Closing Limited Partner shall be void."[30] The Final Effective Date was defined as February

---

[28]The Clapper Entities note that they assert their failure to obtain an appraisal claim
only in the alternative to their claim that Atlantic Midwest is the Managing General Partner.
*See* Clapper Entities' Br. in Supp. of 2nd MSJ at 20 n.10. Because the Court has found that
Atlantic Midwest is in fact the Managing General Partner, it will not address that claim any
further.

[29]If measured by the amount of damages claimed – some $34 million – this Count is
substantially larger than all the other remaining claims in this case.

[30]      The full text of Section 4.01 of the Partnership Agreement provides:
    Capital Contributions.  On the Early Closing Date, the Managing
General Partner [ART Midwest], the Non-Managing General Partner [Atlantic
Midwest] and the Class B Limited Partner [ART] contributed to the capital of
the Partnership, in exchange for [their respective Partnership interests], cash
in the amount of $100 each and, in addition as to [ART], the ART Promissory
Note in the amount of $500,000.  On the Final Closing Date, [ART] will
contribute to the capital of the Partnership, cash and the ART Promissory Note
in the amount of $2,500,000, less any prior principal demands made and paid
under the $500,000 note in exchange for the original $500,000 ART
Promissory Note.  A portion of the cash contributed and to be contributed by

ORDER – PAGE 45

1, 1999.  No additional Class A Limited Partnership Units were issued after the Early

Closing Date.  The subsections of Section 4.02 that the Clapper Entities claim were breached

provide:

--------

> [ART] shall be distributed in accordance with Section 5.07.  On the Early
> Closing Date, pursuant to the applicable [C&E] Agreement, the Early Closing
> Limited Partner [Atlantic XIII] contributed to the capital of the Partnership its
> interest in the [Indiana] Properties, subject to the portion of the Debt
> applicable thereto, in exchange for [649,486] Early Closing Units . . . and
> which on the Final Closing Date shall be increased as provided . . . which
> increase shall be effective for purposes of computing the Preferred Annual
> Return as of the Early Effective Date.  On the Final Closing Date, pursuant to
> the applicable [C&E] Agreement, each Final Closing Limited Partner shall
> contribute to the capital of the Partnership its interest in the Properties, subject
> to the portion of the Debt applicable thereto, in exchange for the number of
> Final Closing Units set forth opposite its name on Exhibit A.  In the event of
> default by the Partnership or any Partner of its respective obligations under a
> [C&E] Agreement at the Final Closing Date, the non-defaulting party may
> exercise the options described in Section 5 of the [FAC&E Agreement].  The
> Partnership may place liens on, and/or grant other security interests in, the
> Properties (collectively, the "Financing Liens") in connection with any
> refinancing of the Debt or any financing which the Partnership or [ART] may
> obtain (subject to the provisions of Section 6.01(c)(iii)), and [Atlantic XIII]
> hereby agree[s] to execute and deliver all documents reasonably requested in
> furtherance of such Financing Liens.  The Partners hereby agree that the
> Partnership may guarantee any such financing subject to the provisions of
> Section 6.01(c) and may secure any such financing or guaranties with the
> Financing Liens.  The contributions of [Atlantic XIII] were made pursuant to
> the [C&E] Agreement. All contributions made on the Early Closing Date shall
> be deemed to be made on the Early Effective Date for purposes of accrual of
> the Preferred Annual Return.  All contributions made on the Final Closing
> Date shall be deemed to be made on the Final Effective Date for purposes of
> accrual of the Preferred Annual Return.  If no additional Class A Limited
> Partnership Units are issued after the Early Closing Date, references to the
> Final Closing Date, Final Closing Properties, Final Closing Units, Final
> Effective Date and Final Closing Limited Partner shall be void.

Partnership Agreement § 4.01 (emphasis added).

(c)　　Additional Capital Contribution by ART. If, on any Distribution Date, the Partnership does not distribute to the Class A Limited Partners all or any part of the Quarterly Preferred Return, then no later than ten Business Days thereafter (provided the Partnership has not yet made such payments) ART shall pay directly to the Class A Limited Partners an amount equal to the amount of the Quarterly Preferred Return unpaid on such Distribution Date.  Any amount so paid shall be deemed an Additional Capital Contribution to the Partnership by ART and a distribution to the Class A Limited Partners pursuant to Section 5.02(a)(i ) and 5.02(a)(ii) of this Agreement.

(d)　　Annual Appraisal. Commencing on the second anniversary of the Final Effective Date, the Managing General Partner [then Atlantic Midwest[31]] shall obtain an appraisal of the Property [by an appraiser reasonably satisfactory to Atlantic Midwest pursuant to section 10.02(c)] on an annual basis, and if the appraised value of the Property is less than the sum of (i) all outstanding liens on the Property and other partnership indebtedness plus (ii) the Outstanding Class A Limited Partnership Unit Equity then outstanding, *ART shall contribute additional assets*, whose value will be determined by appraisal as provided in Section 10.02(c), to the Partnership *such that the value of all assets of the Partnership equal or exceed the sum of (i) all outstanding liens on the Property and other partnership indebtedness plus (ii) the Outstanding Class A Limited Partnership Unit Equity then outstanding*.  Any amounts so contributed shall be deemed an Additional Capital Contribution to the Partnership by ART.  Commencing on the second anniversary of the Final Effective Date, no distributions pursuant to Section 5.02 shall be made to ART, or any Affiliate of ART, during any period that the appraised value of the Property is less than the sum of (i) all outstanding liens on the Property and other partnership indebtedness plus (ii) the Outstanding Class A Limited Partnership Unit Equity then outstanding.

Partnership Agreement § 4.02(c), (d) (emphasis added).

The obligations in section 4.02(d) are expressly stated in terms of the Final Effective

Date.  Although that term is not in section 4.02(c), that section refers to Quarterly Preferred

Return, which is in turn defined in section 5.02(a)(i), which provides that cash available for

distribution will be distributed to the partners "first, to the Class A Limited Partners in an

---

[31]As explained above, in Part VII(A), Atlantic Midwest elected to become Managing General Partner of the Partnership on December 9, 1999.

amount equal to the Preferred Annual Return, payable with respect to the prior calendar quarter (such portion, the 'Quarterly Preferred Return') . . . ." Partnership Agreement § 5.02(a)(i) (emphasis in original). Finally, "Preferred Annual Return" is defined in terms of the Final Effective Date. *See* Partnership Agreement at 9. The ART Entities argue that because no additional Class A Limited Partnership Units were issued after the Early Closing Date, then pursuant to section 4.01 references to the Final Effective Date are void, and therefore their obligations to perform under sections 4.02(c) and (d), which are expressed in terms of the Final Effective Date, are also void.

The Clapper Entities respond that, even if this were a correct construction of the Partnership Agreement,[32] the ART Entities cannot take advantage of it because they were the parties that prevented distribution of additional Class A Limited Partnership Units by wrongfully defaulting under the MA.[33] "It is elementary that one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is made to depend cannot avail himself of its nonperformance." *II Deerfield Ltd. P/S v. Henry Bldg., Inc.*, 41 S.W.3d 259, 265 (Tex. App. – San Antonio 2001, pet. denied) (quoting *Rich v. McMullan*, 506 S.W.2d 745, 747 (Tex. Civ. App. – San Antonio 1974, writ ref'd n.r.e.)). *Accord Girma v. Compass Bank*, 2006 WL 1499983, at *3 (N.D. Tex. 2006);

---

[32]A matter they dispute with some vigor.

[33]The Clapper Entities' briefing on this point is de minimis. They moved for leave to file a supplemental brief on this point, primarily addressing a recent Federal Circuit case [621]. The Court denies that motion as moot because the arguments set forth in the proposed brief do not address the controlling legal issues as discussed in this Order.

*Donaldson v. Digital Gen'l Sys.*, 168 S.W.3d 909, 916 (Tex. App. – Dallas 2005, pet. denied); *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. – Houston [1st Dist.] 2003, pet. denied). Thus, the ART Entities cannot rely on the failed condition to excuse their performance under the Partnership Agreement.

It is undisputed that the ART Entities did not make payments to the limited partners as required by section 4.02(c) or contribute assets as required by section 4.02(d). The Clapper Entities are thus entitled to summary judgment of liability on those claims (Counts XIII and XV). The Court holds that the Clapper Entities fail to establish the amount of damages for breach of section 4.02(d). Their summary judgment proof seems to be copies of demand letters, which themselves have attached illegible copies of accountant workpapers. It appears that there was testimony regarding these documents at trial, but the Clapper Entities fail to include that testimony in their summary judgment proof; nor did they offer any affidavits or deposition testimony supporting the accuracy of the illegible calculations. It may be that the calculations are correct; the Court declines to accept them on faith.[34] The Court thus denies the Clapper Entities' motion for summary judgment with respect to the amount of damages for breach of section 4.02(d) of the Partnership Agreement.

Section 4.02(c) is a different matter. The Partnership Agreement itself sets forth the manner for calculating the Quarterly Preferred Return. The ART Entities do not contest the

---

[34]For example, it is not clear from the summary judgment record whether the amount claimed for 2002 ($9,905,428) is cumulative and assumes the amount claimed for 2001 ($6,728,719) was never paid. If so, awarding both would be double counting. Likewise, the calculations fail to reflect the termination of the partnership on May 20, 2002, as the Court has found.

ORDER – PAGE 49

calculations reflected in the Clapper Entities' motion for summary judgment. The Clapper Entities' calculation extends past the date on which the Court had determined that the Partnership dissolved. As no further liability for breach could accrue after that date, the Court adjusts the damage calculation accordingly. The Court accordingly holds that Atlantic XIII is entitled to summary judgment against ART for breach of section 4.02(c) of the Partnership Agreement in the amount of $197,212.23.

### B. Sections 6.01, 6.11, or 4.01 of the Partnership Agreement (Count VIII)

The Clapper Entities' counterclaim in Count VIII comprises claims for breach of sections 6.01 and 6.11 of the Partnership Agreement against ART Midwest and breach of section 4.01 of the Partnership Agreement against ART.

The Court grants summary judgment in favor of ART Midwest on the Clapper Entities' counterclaim against ART Midwest in Count VIII for breach of section 6.11(a) and (b) because the Clapper Entities have offered no evidence of damages to support these counterclaims for breach. The Court denies both sides' motions for summary judgment on the Clapper Entities' counterclaim against ART Midwest in Count VIII for breach of section 6.01 because an ambiguity exists as to the parties' intent regarding ART Midwest's obligations under section 6.01(c)(v). The Court grants summary judgment in favor of ART on the Clapper Entities' counterclaim against ART in Count VIII because the Clapper Entities have offered no evidence of any breach of section 4.01 of the Partnership Agreement.

*1. Section 6.01.* – The parties have two conflicting, but reasonable interpretations of section 6.01(c)(v).  As a result, the Court finds this provision is ambiguous and raises a genuine issue of material fact as to the parties' intent regarding ART Midwest's obligations under section 6.01(c)(v).  Accordingly, the Court denies both sides' motions for summary judgment on Atlantic Midwest and Atlantic XIII's counterclaim in Count VIII for breaching this section of the Partnership Agreement.  Section 6.01(c) of the Partnership Agreement states:

> Notwithstanding anything to the contrary herein provided, until the first to occur of (i) the disposition by the Class A Limited Partners who were the Class A Limited Partners on the Final Closing Date of more than 80% of the Class A Limited Partnership Units owned by them on the Final Closing Date . . . and (ii) the tenth anniversary of the Final Effective Date [February 1, 2009], the Managing General Partner [ART Midwest] shall not, on behalf of the Partnership, without the consent of the Non-Managing General Partner [Atlantic Midwest]:
>
> * * *
>
> (v) allow any balloon payment on any indebtedness secured by a Property to mature before refinancing such indebtedness.

Partnership Agreement § 6.01(c)(v).

ART Midwest denies it had any obligation to contribute funds to the Partnership to prevent a balloon payment from maturing.  *See* ART's Reply re. MSJ [618] at 11.  ART Midwest implies that it had no duty to prevent a balloon payment from maturing under section 6.01(c)(v) of the Partnership Agreement unless sufficient Partnership funds were reasonably available to discharge such obligation.  *See id.*  ART Midwest points to the Partnership Agreement section 6.01(b) to support its argument.  *See id.*  Section 6.01(b) provides:

> Except as otherwise provided herein or in the [Texas Revised Limited
> Partnership] Act, to the extent the duties of the Managing General Partner
> [ART Midwest] require expenditures of funds to be paid to third parties, the
> Managing General Partner shall not have any obligations hereunder except to
> the extent that Partnership funds are reasonably available to it for the
> performance of such duties.

Partnership Agreement § 6.01(b).  The Clapper Entities argue that section 6.01(b) only

applies "Except as otherwise provided," and does not insulate ART Midwest from liability

under section 6.01(c), which, according to the Clapper Entities, "otherwise provides" by

imposing a duty to refinance on ART Midwest, "notwithstanding anything to the contrary."

*See* Partnership Agreement § 6.01(c); *see also* Clapper Resp. to ART MSJ [612] at 28–29.

Particularly in light of section 6.01(b), section 6.01(c)(v) is ambiguous with respect

to ART Midwest's obligations.[35]  The parties' conflicting interpretations of section 6.01(c)(v)

are both reasonable and raise a genuine issue of material fact as to the parties' intent

regarding which provision takes precedence.  Accordingly, the Court denies both sides'

motions for summary judgment on the counterclaim in Count VIII for breach of section 6.01

of the Partnership Agreement.

*2. Section 6.11(a).* – The Clapper Entities have set forth no evidence that they were

damaged as a result of ART Midwest's breach of section 6.11(a) of the Partnership

---

[35]Neither side here has pled ambiguity, but that is irrelevant.  "A court may conclude
that a contract is ambiguous even in the absence of such a pleading by either party."  *Specht
v. Maximus Inc.*, 2009 WL 2709313, at *7 (5th Cir. 2009) (unpublished, quoting *Sage St.
Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993)).  *Accord Crisalli v. ARX
Holding Corp.*, 177 Fed. Appx. 417, 420 (5th Cir. 2006); *In re Newell Indus., Inc.*, 336 F.3d
446, 449 n.5 (5th Cir. 2003).

Agreement.[36]  Accordingly, the Court grants summary judgment in favor of ART Midwest on Atlantic Midwest and Atlantic XIII's counterclaim in Count VIII for breaching this section of the Partnership Agreement.  Section 6.11(a) of the Partnership Agreement states, in relevant part:

> The Managing General Partner [ART Midwest] shall be obligated, and hereby agrees, to notify the Non-Managing General Partner [Atlantic Midwest] and each Class A Limited Partner [Atlantic XIII] of the occurrence of any default by the Partnership or the Managing General Partner under any loan agreement to which the Partnership is a party.

Partnership Agreement § 6.11(a).

ART Midwest argues that the Clapper Entities' have not alleged a lack of actual knowledge of the Partnership's default on the Inland note and that the Clapper Entities in fact had actual notice, which would negate the element of damages essential to the Clapper Entities' counterclaim.  *See* ART Br. in Resp. to Clapper MSJ [615] at 30–31; *see also 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys, Inc.*, 245 S.W.3d 488, 505 (Tex. App. – Houston [14th Dist.] 2007, pet. denied) (upholding jury finding that lessee's failure to provide contractually required notice to lessor did not cause lessor's damage when lessor had actual notice of the subject matter).  Instead of demonstrating that they lacked notice of the Partnership's default or otherwise alleging how they were damaged as a result of that default, the Clapper Entities merely reiterate that ART Midwest breached section 6.11(a) by failing to provide the agreed upon notice.  *See* Clapper Reply in Supp. of MSJ [617] at 14.

---

[36]*See* ART Br. in Supp. of MSJ [606] at 37 ¶67 (making "no evidence" argument).

ORDER – PAGE 53

Because the Clapper Entities have set forth no evidence of damages resulting from ART Midwest's failure to notify Atlantic XIII of a Partnership default, the Court grants summary judgment in favor of ART Midwest on the counterclaim in Count VIII for breaching section 6.11(a) of the Partnership Agreement.

*3. Section 6.11(b).* – The Clapper Entities have set forth no evidence that they were damaged as a result of ART Midwest's breach of section 6.11(b) of the Partnership Agreement.[37] Accordingly, the Court grants summary judgment in favor of ART Midwest on Atlantic Midwest and Atlantic XIII's counterclaim in Count VIII for breaching this section of the Partnership Agreement. Section 6.11(b) of the Partnership Agreement states:

> The Managing General Partner [ART Midwest] hereby agrees that it will not file a petition in any bankruptcy or insolvency proceeding during such time as there are any Class A Limited Partnership Units that have not been transferred to ART or the Partnership, without the consent of the Non-Managing General Partner [Atlantic Midwest].

Partnership Agreement § 6.11(b). The parties do not dispute that ART Midwest, without the consent of Atlantic Midwest, the Non-Managing General Partner, filed bankruptcy on behalf of the Partnership, ART Country Squire, and ART Concord East in the United States Bankruptcy Court for the Northern District of Texas on August 11, 1999. *See* Clapper Br. in Supp. of MSJ Ex. 7 [604-9]. However, the Clapper Entities have set forth no evidence of damages resulting from the bankruptcy filings and ART Midwest's breach of the Partnership Agreement section 6.11(b). Accordingly, the Court grants summary judgment in favor of

---

[37]*See* ART Br. in Supp. of MSJ [606] at 37 ¶67 (making "no evidence" argument).

ORDER – PAGE 54

ART Midwest on the counterclaim in Count VIII for breaching section 6.11(b) of the Partnership Agreement.

**4. Section 4.01.** – The Court grants summary judgment in favor of the ART Entities on the Clapper Entities' counterclaim in Count VIII against ART for breach of section 4.01 of the Partnership Agreement.[38]  Section 4.01 notes that ART contributed a $500,000 promissory note to the capital of the Partnership on November 19, 1998 – the Early Closing Date and the date the Partnership Agreement was signed.  *See* Clapper Br. in Supp. of MSJ [604] at 16; Partnership Agreement § 4.01; Demand Note [604-34].  The Clapper Entities seem to seek enforcement of the promissory note through their counterclaim against ART in Count VIII for breach of the Partnership Agreement.  Essentially, the Clapper Entities argue that because ART contributed the promissory note to the Partnership under the Partnership Agreement, ART's failure to fulfill its obligations under the promissory note is also a breach of the Partnership Agreement.  However, ART's obligations under the promissory note did not automatically become obligations under the Partnership Agreement merely because section 4.01 made the note a capital contribution to the Partnership.  Likewise, if ART failed to meet its obligations to the Partnership under the promissory note, that failure is not, without more, a breach of section 4.01 of the Partnership Agreement.

---

[38]Both sides appear to treat Count VIII as raising a claim for breach of section 4.01 of the Partnership Agreement.  The Counterclaim itself does not appear to mention section 4.01.  *See* Clapper Br. in Supp. of MSJ [604], Ex. 3 at 35, ¶¶ 146-50 (Count VIII).  Given that the parties have addressed this claim, the Court will do likewise.

## IX. A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER THE ART ENTITIES ARE LIABLE FOR BREACH OF FIDUCIARY DUTIES (COUNT IX)

The Court denies both sides' motions for summary judgment on the Clapper Entities' counterclaim in Count IX against ART and ART Midwest for breach of their fiduciary duties under the Partnership Agreement because a genuine issue of material fact exists as to whether the ART Entities breached their fiduciary duties.

First, the ART Entities argue that ART is entitled to summary judgment because ART is a limited partner and limited partners lack fiduciary duties as a matter of law. *See* ART Br. in Supp. of MSJ [606] at 30; ART Br. in Resp. to Clapper MSJ [615] at 45; ART's Reply re. MSJ [618] at 20. Next, the ART Entities argue that even if ART had fiduciary duties to its other partners, section 8.03 of the Partnership Agreement eliminates any liability for breach of those duties. *See* ART Br. in Supp. of MSJ [606] at 27. Finally, the ART Entities argue that section 6.01(b) of the Partnership Agreement negates any liability on the part of ART Midwest for breaching its fiduciary duties. *See id.* The Clapper Entities argue that both ART and ART Midwest owed fiduciary duties to their other partners, Atlantic Midwest and Atlantic XIII, and breached those duties by, among other things, failing to act in good faith and causing waste of Partnership assets. *See* Clapper Complaint at 36 ¶ 152; Clapper Br. in Supp. of MSJ [604] at 40–42.

After reviewing both sides' arguments and the law summarized below, the Court holds the record reflects a genuine issue of material fact as to whether a fiduciary relationship arose between ART and its other partners, and as to whether either or both of the ART Entities breached their fiduciary duties to Atlantic Midwest and Atlantic XIII.

ORDER – PAGE 56

The elements of a claim for breach of fiduciary duties under Texas law are: "(1) that the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiffs; and (3) the defendant's breach resulted in injury to the plaintiff." *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 176, 192 (S.D. Tex. 2007) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. – Dallas 2006, pet. denied)) (granting summary judgment in favor of lender in part because borrower failed to establish a fiduciary relationship). "Fiduciary duties arise as a matter of law in certain formal relationships, including . . . partnership, and trustee relationships." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). With respect to the fiduciary duties of a general partner, the Fifth Circuit recently noted:

> Under Texas law, managing partners owe trust obligations to the partnership, having a duty of loyalty and due care as well as being under an obligation to discharge their duties in good faith and in reasonable belief that they are acting in the best interest of the partnership. TEX. REV. CIV. STAT. art. 6132b-4.04(b)-(d). Texas courts have long held that "[i]t is axiomatic that a managing partner in a general partnership, owes his co-partners the highest fiduciary duty recognized in the law." *Crenshaw v. Swenson*, 890 (Tex. Civ. App. [– Austin] 1980[, writ ref'd n.r.e.]).

*McBeth v. Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009).

Texas law also recognizes that limited partners owe fiduciary duties to their other partners, "applying the same partnership principles that govern the relationship between a general and limited partners." *Id.* (citing *Dunnagan v. Watson*, 204 S.W.3d 30, 46–47 (Tex. App. – Fort Worth 2006, pet. denied); *Zinda v. McCann St., Ltd.*, 178 S.W.3d 883, 890 (Tex. App. 2005 – Texarkana, pet. denied)). The extent to which a limited partner may have exerted control over the partnership's affairs – without regard to any prohibition

in the partnership agreement against exercising such control – will influence a finding of a fiduciary relationship between a limited partner and its other partners.  *See McBeth*, 565 F.3d at 177–78 (citing *In re Bennett*, 989 F.2d 779, 789–90 (5th Cir. 1993)).

ART argues that because it was a limited partner and because section 6.03 of the Partnership Agreement prohibited limited partners from exercising control over the Partnership, it could not have owed any fiduciary duties to the other partners.[39]  However, in *McBeth*, the Fifth Circuit recently upheld a jury finding that two limited partners owed, and breached, fiduciary duties to their other partners despite the fact that the limited partnership agreement in that case "specifically stated that the general partner retained exclusive control and management over the partnership."  *See McBeth*, 565 F.3d at 178.  In light of this authority and Texas law, as set forth above, the Court cannot find as a matter of law that ART had no fiduciary relationship with or duties to its other partners.

Additionally, neither section 8.03 nor section 6.01(b) of the Partnership Agreement bars the Clapper Entities' counterclaims for breach of fiduciary duties against either of the ART Entities.  The relevant portion of section 8.03 states:

> Neither the Non-Managing General Partner [Atlantic Midwest] nor the Limited Partners [ART and Atlantic XIII] shall be liable for any debts,

---

[39]Section 6.03 of the Partnership Agreement provides, in relevant part:
Non-Managing General Partner and Limited Partners Shall Not Manage or Control.  Except as otherwise provided herein, neither the Non-Managing General Partner [Atlantic Midwest] nor the Limited Partners [ART and Atlantic XIII] shall take any part in the management of the Partnership business, shall transact any business for the Partnership or shall have any power to act for or to bind the Partnership.
Partnership Agreement § 6.03.

ORDER – PAGE 58

liabilities, contracts or obligations of the Partnership. [Atlantic Midwest, Atlantic XIII, and ART] shall be liable to the Partnership only to make payments of its Capital Contribution, if any, as and when due hereunder. After its Capital Contribution is fully paid, such Partners shall not, except as otherwise required by the Act or herein, be required to make any further Capital Contributions or other payments or lend any funds to the Partnership.

Partnership Agreement § 8.03. This provision limits ART's liability for "debts, liabilities, contracts or obligations of the Partnership." *See id.* But it does not eliminate any fiduciary duties ART may owe its other partners or shield ART from liability for breach of those duties.

Likewise, section 6.01(b) of the Partnership Agreement which is set forth above, at subpart VIII(B)(1), states that insomuch as ART Midwest's duties as Managing General Partner required "expenditures of funds to be paid to third parties," ART Midwest's obligation was limited to "funds . . . reasonably available to it." *See* Partnership Agreement § 6.01(b). This provision does not negate ART Midwest's liability for breaching its fiduciary duties.

The Clapper Entities argue that as a result of its obligations under the Partnership Agreement, such as paying quarterly preferred returns, ART had fiduciary duties to act for the benefit of its other partners. *See* Clapper Reply in Supp. of MSJ [617] at 25. The Clapper Entities further argue that ART's failure to pay quarterly returns, both ART Entities' failure to act in good faith and causing waste of Partnership assets, and ART Midwest's refusal to provide information to a partner constituted breaches of the ART Entities' fiduciary duties. Like the ART Entities' arguments, the Clapper Entities' arguments

regarding Count IX also present a genuine issue of material fact as to whether the ART Entities breached their fiduciary duties.

Accordingly, neither party is entitled to judgment as a matter of law and the Court denies both sides' motions for summary judgment on Count IX.

## X. ART IS LIABLE FOR BREACHING THE EXCHANGE & REGISTRATION RIGHTS AGREEMENT (COUNT XI)

ART breached the Exchange & Registration Rights Agreement ("Exchange Agreement") section 2.1(a).  Accordingly, the Court grants summary judgment on liability in favor of the Clapper Entities on their counterclaim in Count XI against ART for breach of section 2.1(a) of the Exchange Agreement.[40]  Section 2.1(a) of the Exchange Agreement states, in relevant part:

> [E]ach Class A Limited Partner [Atlantic XIII] shall have the right, from time to time beginning the day immediately following the first anniversary of the Effective Date [February 2, 2000], but no later than the tenth anniversary of the Effective Date [February 1, 2009], to require [ART] to exchange all or a portion of the Class A Units . . . held by [Atlantic XIII] for shares of Preferred Stock[41] (such right, a "Preferred Stock Exchange

---

[40]Section 2.1(a) imposes obligations only on ART.  Additionally, the Clapper Entities seem to have conceded to dismissal of Count XI against ART Midwest (albeit, referring to the counterclaim as Count IX).  *See* Clapper Resp. to ART MSJ [612] at 26; Clapper Reply in Supp. of MSJ [617] at 10.  Accordingly, to the extent the Clapper Entities asserted a breach of contract counterclaim in Count XI against ART Midwest, the Court grants summary judgment in favor of ART Midwest on Count XI.

[41]The Exchange Agreement defines "Preferred Stock" as "the Series F Cumulative Convertible Preferred Stock of [ART] issued by [ART] to the Class A Limited Partners upon an exchange pursuant to Section 2.1, having attributes substantially similar to those set forth in the Articles of Amendment."  Exchange Agreement at 2.  The "Articles of Amendment" are "the Articles of Amendment of the Articles of Incorporation of [ART] setting forth the Certificate of Designations, Preferences and Relative Participating or Optional or Other

> Right") upon forty-five (45) days prior written notice to [ART], which notice
> shall be in the form of a Notice of Exchange. [Atlantic XIII] shall exchange
> no less than 10,000 Class A Units . . . upon the exercise of the Preferred Stock
> Exchange Right in question. Affected Class A Units shall be exchangeable for
> shares of Preferred Stock at the rate of one (1) share of Preferred Stock for
> each ten (10) of such Affected Class A Units.

Exchange Agreement § 2.1(a). The Clapper Entities argue that under the Exchange
Agreement, Atlantic XIII still has the right to exchange its partnership units for cash or
preferred stock in ART.[42] Atlantic XIII does not have the right to exchange its partnership
units for cash because ART did not exercise its right to purchase the partnership units for
cash, leaving a stock exchange as ART's only option, and obligation, under section 2.1 of
the Exchange Agreement. Because ART refused this exchange, Atlantic XIII has a damage
claim for breach of the Exchange Agreement.[43]

In its Aug. 15 Order, the Court found that "Atlantic XIII rejected the Partnership's
request and did not return the [649,486] Units [with par value $1.00 each] that the

---

Special Rights, and Qualifications, Limitations or Restrictions thereof of Series F Cumulative
Convertible Preferred Stock, as filed with the Secretary of State of the State of Georgia." *Id.*
at 1.

[42]Section 2.1(b) of the Exchange Agreement gave ART the right to purchase tendered
Class A Partnership Units for cash instead of exchanging them for Preferred Stock, but only
if ART elected to exercise that right within forty-five days of receiving notice of exchange
from Atlantic XIII. Because ART did not purchase Atlantic XIII's units within forty-five
days of receiving notice, ART was "deemed not to have exercised its Preferred Stock
Exchange Purchase Right" and became "obligated to deliver . . . the shares of Preferred Stock
required pursuant to Section 2.1(a)." *See* Exchange Agreement § 2.1(b).

[43]The question of the measure of damages is not presently before the Court. Nor is
the question of election of remedies presently before the Court. If Atlantic XIII proceeds to
judgment on this Count, it would presumably waive whatever rights is might have as a
limited partner in the Partnership after March 28, 2000.

ORDER – PAGE 61

Partnership tendered when the parties closed on the Indiana Apartments." Aug. 15 Order at 14. The ART Entities have submitted no evidence to contest the Clapper Entities' claim that Atlantic XIII still remains in possession of those units.

The ART Entities do not argue that ART complied with the terms of the Exchange Agreement. Instead, the ART Entities argue that ART had no obligations under the Exchange Agreement by the time Atlantic XIII provided notice of exchange. The ART Entities argue that the MA and C&E Agreements had already been terminated when Atlantic XIII provided notice of exchange and, by its association with those agreements, the Exchange Agreement had also been terminated. However, the Exchange Agreement sets the terms of its own termination. According to section 4.11, the Exchange Agreement "shall terminate at such time as neither the Class A Limited Partners nor any Permitted Assignee holds any Class A Units or ten years from the Effective Date, whichever occurs first." Exchange Agreement § 4.11. Atlantic XIII held 649,486 partnership units on March 28, 2000, when it provided notice of exchange.

Accordingly, ART had an obligation under the Exchange Agreement to purchase those units for cash or exchange them for preferred stock in ART. ART did not exercise its right to purchase the units for cash. Therefore, ART was obligated to exchange the units for preferred stock, which it failed to do. As a result, the Court concludes that while Atlantic XIII performed or tendered performance under the Exchange Agreement, ART breached section 2.1(a) of the Exchange Agreement, which resulted in damages to Atlantic XIII.

Accordingly, the Court grants summary judgment on liability in favor of Atlantic XIII on Count XI of its counterclaim for breach.

Section 38.001 of the Texas Civil Practice & Remedies Code entitles Atlantic XIII to an award of attorneys' fees, as requested, for its Count XI breach of contract claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2008) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: . . . (8) an oral or written contract."). Likewise, the Clapper Entities are entitled to reasonable attorneys' fees as requested for all the breach of contract claims on which they prevail under Texas law. However, the amount of those requests are not presently before the Court.

## XI. BREACH OF THE INDIANA AGREEMENTS

The elements of a claim for breach of contract under Indiana law are: (1) existence of a contract, (2) defendant's breach of that contract, and (3) damages. *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. App. 2000); *see also Fairfield Devel., Inc. v. Georgetown Woods Sr. Apts. Ltd. P'ship*, 768 N.E.2d 463, 473 (Ind. App. 2002). Additionally, "[a] person typically cannot be held liable for breach of contract unless it is shown that he was a party to the contract." *Columbia Club, Inc. v. Am. Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind. Ct. App. 1999). And, "[o]nly the real party in interest may bring a suit to recover damages allegedly resulting from breach of contract." *Rollins Burdick Hunter of Utah, Inc. v. Bd. of Trs. of Ball State Univ.*, 665 N.E.2d 914, 919 (Ind. Ct. App. 1996). "To be a real party in interest, one must have a present or substantial interest in the

relief sought and be entitled to the fruits of the action." *Town of Munster v. Hluska*, 646 N.E. 2d 1009, 1014 (Ind. App. 1995) (citing *Brenner v. Powers*, 584 N.E.2d 569, 574 (Ind. App. 1992); *Estate of Ryan v. Great-West Life Assurance Co.*, 517 N.E.2d 109, 110 (Ind. App. 1987)).

### A. ART Midwest is Liable for Breaching the Indemnification Agreement (Count VI)

ART is not a proper defendant on Count VI because ART was not a party to the Indemnification Agreement. *See Columbia Club*, 720 N.E.2d at 417 (Ind. Ct. App. 1999) ("Contractual obligations are personal in nature and privity of contract is essential for the establishment of such liability."). Accordingly, the Court grants summary judgment in favor of ART only on Count VI of the Clapper Entities' counterclaim for breach.

Because the Court finds the record does not reflect a genuine issue of material fact with respect to whether ART Midwest breached the Indemnification Agreement, the Court grants summary judgment in favor of Clapper and Atlantic XIII on Count VI of their counterclaim against ART Midwest for breach of the Indemnification Agreement.

ART Midwest is a proper defendant on Count VI. Under section 23-16-5-3(c) of the Indiana Revised Uniform Limited Partnership Act ("IRULPA"), "[e]xcept as provided in [the IRULPA] or in the partnership agreement," the general partner of a limited partnership "has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners." *See* IND. CODE § 23-16-5-3(c) (2005).[44] And, under section 23-16-5-3(b)

---

[44]The Indemnification Agreement provides that it "shall be governed by and construed and enforced in accordance with the laws of the State of Indiana, without regard to the principles thereof regarding conflict of laws." Indemnification Agreement § 10.

of the IRULPA, "[e]xcept as provided in [the IRULPA]," the general partner of a limited

partnership may be held liable "to persons other than the partnership and the other partners,"

just as a partner in a partnership without limited partners.[45]  *See* IND. CODE § 23-16-5-3(b)

(2005).  In *Gallatin Group v. Central Life Assurance Co.*, an Indiana court of appeals also

noted that "[i]t is well established that in a partnership the partners are bound by the contracts

of each other when made in the scope of the firm's business," and that while partners

generally are jointly liable for partnership obligations, "the terms of a contract may be such

as to bind the partners individually."  650 N.E.2d 70, 72–73 (Ind. App. 1995) (citing 23

INDIANA LAW ENCYCLOPEDIA PARTNERSHIPS § 81 (now at § 31) ; *Lanier v. Wallace*, 17 N.E.

923, 924 (Ind. 1888)).  In addition to Clapper and Atlantic XIII, ART Country Squire and the

Partnership were parties to the Indemnification Agreement.  ART Midwest was a general

partner of the Partnership.   If ART Midwest caused the Partnership to breach the

Indemnification Agreement, then the Clapper Entities may hold ART Midwest liable for that

breach.

    The Clapper Entities are entitled to summary judgment on Count VI against ART

Midwest because they have demonstrated that no genuine issue of material fact exists with

respect to ART Midwest's liability for breach of the Indemnification Agreement.  The ART

---

Additionally, all parties seem to agree that Indiana law applies to this count.

    [45]IRULPA section 23-16-5-3(b) applies to Clapper's counterclaim in Count VI
because he is not a partner, and to Atlantic XIII's counterclaim in Count VI because Atlantic
XIII signed the Indemnification Agreement in its capacity as an independent entity, and not
on behalf of the Partnership or in its capacity as a limited partner.

Entities do not dispute the existence of the Indemnification Agreement.  It was signed on

November 19, 1998, sixteen days after the MA, C&Es, and FAC&E.  The key provision of

the Indemnification Agreement, which is at issue in Count VI, states:

> The Partnership and ART Country Squire, jointly and severally, hereby
> agree to indemnify and hold Clapper, Atlantic XIII and their affiliates, [etc.]
> harmless from and against any and all losses, claims, damages, liabilities,
> and expenses including reasonable attorneys' fees and expenses, arising out of or
> in connection with any claims with respect to the First Lien Loan accruing on
> or after the Effective Date [November 1, 1998].

Indemnification Agreement § 4.

The Clapper Entities, before requiring indemnification from the Partnership, were

required promptly to provide written notice of any claim that arose with respect to the First

Lien Loan after the Effective Date:

> Whenever and if a claim arises under which either Atlantic XIII, [or]
> Clapper . . . intends to require indemnification, . . . written notice of such claim
> shall promptly be given to the party whose indemnity obligation is to be
> charged (the "Indemnifying Party"), which notice shall specify with
> particularity the nature of the claim and, to the extent then known, the amount
> thereof.

Indemnification Agreement § 5.  The parties do not dispute that the Clapper Entities provided

written notice of a claim to the Partnership as section 5 required.  Neither do the parties

dispute whether the Partnership, ART Country Squire, or any ART Entity indemnified or

held the Clapper Entities harmless with respect to the Inland note.  Finally, the parties do not

dispute the amount of damages resulting from failure to indemnify the Clapper Entities with

respect to the Inland note (i.e., $2,530,298.25, the amount of the judgment against the

Clapper Entities on the Inland note, plus interest).  Instead, the ART Entities rely on the

ORDER – PAGE 66

damages provision set forth in the MA and the Indiana C&E Agreement to negate damages incurred as a result of its breach of the Indemnification Agreement. That reliance is misplaced, as the Court explains above, in Part VI(A). As a result, no genuine issue of material fact exists – the Partnership breached the Indemnification Agreement and ART Midwest, as general partner at the time of the breach, is liable for that breach. The Court therefore grants summary judgment in favor of the Clapper Entities on Count VI of their counterclaim for breach against ART Midwest.

### B. ART is Liable for Breaching the Assumption Agreement (Count VII)

The Clapper Entities concede that ART Midwest is not liable for any breach of the Assumption Agreement and clarify that their only allegation of breach in Count VII is against ART. *See* Clapper Resp. to ART MSJ [612] at 22.[46] Accordingly, to the extent any counterclaim for breach of the Assumption Agreement remains against ART Midwest, the Court grants summary judgment in favor of ART Midwest on that counterclaim. As a result, the only issue remaining under Count VII is whether either set of movants is entitled to summary judgment on the Clapper Entities' counterclaim against ART for breach of the Assumption Agreement.

The Court grants summary judgment in favor of the Clapper Entities on their Count VII counterclaim against ART for breach of the Assumption Agreement because they have demonstrated that no genuine issue of material fact exists – ART breached the Assumption

---

[46]Specifically, the Clapper Entities concede that ART Midwest was not party or privy to the Assumption Agreement, therefore ART Midwest cannot be liable for breaching that agreement.

ORDER – PAGE 67

Agreement, thereby causing damages to the Clapper Entities. ART does not even allege that it did not breach the agreement and instead relies on arguments, which the Court rejected above, in Parts IV and VI(A), that Count VII is barred by res judicata and that the damages provision in the MA – which facially does not even apply to the Assumption Agreement – limits the Clapper Entities' damages to the Deposit, to which the Court held the Clapper Entities were entitled in its Aug. 15 Order.

Although the ART Entities cursorily state that the Clapper Entities cannot raise a material fact issue on the existence of a valid contract (i.e., the Assumption Agreement), the ART Entities do not set forth any competent summary judgment evidence disputing the existence of the Assumption Agreement or demonstrating that ART, ART Country Squire, Clapper, and Atlantic XIII were not parties to it. *See* ART Br. in Supp. of MSJ [606] at 26. Under that agreement, ART assumed "all obligations, duties, responsibilities and liabilities of Atlantic under the terms of the Loan Documents as if [ART] were an additional signatory thereto...and agree[d] to be a primary obligor under the Loan Documents and under [the Assumption Agreement]." *See* Assumption Agreement [604-14] at ¶ 4. Clapper agreed to serve as guarantor of the loan under the agreement. *Id.* at ¶ 3(c).[47]

---

[47]Under Indiana law, "a guarantor who satisfies the principal debtor's obligation to the creditor generally steps into the shoes of the creditor, becoming subrogated to the creditor's claim and assuming both the creditor's rights and duties." *Farmers Loan & Trust Co. v. Letsinger*, 652 N.E.2d 63, 67 (Ind. 1995) (citing *Ertel v. Radio Corp. of Am*, 307 N.E.2d 471, 474 (Ind. 1974)). *See In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 427 (7th Cir. 2007) (citing *Weissman v. Weener*, 12 F.3d 84, 87 (7th Cir. 1993).

The Clapper Entities allege – and the ART Entities do not dispute – that ART did not in fact pay the amounts owed to Inland on the Inland note as ART agreed to do. Therefore, existence of damages is the only element truly in dispute with respect to the Clapper Entities' counterclaim against ART for breach of the Assumption Agreement. The Court rejected the ART Entities' only argument with respect to damages above, at Part VI(A).

As a result, no genuine issues of material fact exists with respect to the Clapper Entities' counterclaim for breach of the Assumption Agreement and the Court grants summary judgment in favor of the Clapper Entities on their counterclaim against ART for breach of the Assumption Agreement.[48]

While Texas law entitles the prevailing party to an award of attorneys' fees in a breach of contract claim, the Clapper Entities cite no authority for such an award under Indiana law. Accordingly, the Court denies the Clapper Entities' motion to the extent it requests attorneys' fees with respect to Count VII and any other Indiana law-based claims.[49]

------

[48]The Clapper Entities seek as damages $2,530,298.25, the amount of the consent judgment the County of Marion, Indiana court entered against Clapper for default on the Inland note, plus interest. This is the same damage award as they seek in Count VI for breach of the Indemnification Agreement. The Clapper Entities recognize they cannot twice collect the same damages, but rightly argue that they are entitled to a determination on each count. *See* Clapper Br. in Supp. of MSJ [604] at 22; *see also Inland Mortgage Corp. v. Atl. Ltd. P'ship, et al.*, No. 49D06-9906-CP-000877 (Feb. 19, 2002); Clapper Br. in Supp. of MSJ Ex. 11 [604-13].

[49]Indiana Code § 34-52-1-1 provides:
        (b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party: (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless; (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable or groundless; or (3)

CONCLUSION

For the reasons stated above, the Court grants in part and denies in part both sides' motions for summary judgment.

The parties to this litigation have endured Dickensian delay, and the Court has no desire to add to that. However, the parties have also been through one jury trial so far. The Court does not want them to have to go through two more in the (unlikely, one hopes) event the Court has erred in its disposition of any of the multitude of legal questions addressed in this Order. Interlocutory guidance from the Court of Appeals on those legal questions would ensure that only one more trial is required. The Court does not lightly make a section 1292(b) certification, but feels it is merited in this case.

Therefore, the Aug. 15 Order is modified as follows: (1) the Court vacates its ruling granting the ART Entities judgment on Count XVI of the Clapper Entities' counterclaim, and (2) the following language is added to the end of the Order: "The Court is of the opinion that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal of this Order may materially advance the ultimate termination of the litigation." Likewise with respect to this Order, the Court is of the opinion that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal of this Order may materially advance the ultimate termination of the litigation.

---

litigated the action in bad faith.
IND. CODE 34-52-1-1(b).

ORDER – PAGE 70

Signed September 22, 2009.

David C. Godbey
United States District Judge